# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #057

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **13th day of December, 2024** are as follows:

**BY McCallum, J.:**

2021-KP-00812    STATE EX REL. DARRELL J. ROBINSON   VS.  DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY, ANGOLA, LOUISIANA (Parish of Rapides)

VACATED; TRIAL COURT JUDGMENT AFFIRMED; CONVICTION AND DEATH SENTENCE REINSTATED. SEE OPINION.

Weimer, C.J., dissents and assigns reasons.

Hughes, J., dissents for the reasons assigned by Chief Justice Weimer.

Crichton, J., additionally concurs and assigns reasons.

Griffin, J., dissents for the reasons assigned by Chief Justice Weimer.

STATE EX REL. DARRELL J. ROBINSON

VS.

DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY, ANGOLA, LOUISIANA

On Supervisory Writ to the 9th Judicial District Court, Parish of Rapides

On Rehearing

**McCALLUM, J.**[1]

Twenty-eight years ago, on May 28, 1996, four people, including a ten-month old child, were ruthlessly murdered. The victims – Billy Lambert, his sister, Carol Hooper, Carol's daughter, Maureen Kelly, and Ms. Kelly's ten-month old son, Nicholas Kelly – were all shot in the head; Lambert was shot twice. The infant's dislodged baby bottle came to rest on the floor just inches beyond his outstretched grasp; a grim illustration of the helpless victims' plight.

The order in which the victims were slain cannot be determined from the record; there are twenty-four possible permutations. Nevertheless, logic dictates the certainty that three members of the family, in addition to suffering the fear of their own impending doom, had to sequentially endure the indescribable horror of witnessing the slaughter of one or more of the people they loved and cherished. The final impressions of life that swept these three victims to their graves would have been the explosions of gunpowder propelling .38 caliber lead projectiles toward the helpless targets, the sight of the destructive trauma inflicted by the blasts, and the muffled moans and labored gasps for air as death overshadowed its victims.

---

[1] Justice Jeannette Theriot Knoll, retired, appointed Justice Pro Tempore, sitting for the vacancy in the Louisiana Supreme Court District 3.

Darrell J. Robinson, defendant, was unanimously convicted of the murders in 2001. Upon the jury's recommendation, the trial court imposed a sentence of death. Defendant's conviction and sentence were affirmed by this Court. *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So. 2d 66 ("*Robinson I*"). The United States Supreme Court declined to review the case. *See Robinson v. Louisiana*, 543 U.S. 1023 (2004).

In 2005, defendant filed an application for post-conviction relief, and after the trial court denied his application on March 31, 2020, defendant sought review of that ruling in this Court. In *State ex rel. Robinson v. Vannoy*, 21-00812 (La. 1/26/24), 378 So. 3d 11, *reh'g granted*, 21-00812 (La. 3/21/24), 382 So. 3d 27 ("*Robinson II*"), the Court set aside defendant's conviction and sentence and remanded for a new trial. The majority's opinion was based on its view that defendant's due process rights were violated by the State's suppression of "material impeachment and exculpatory evidence" and presentation of "false and misleading testimony and argument to the jury." *Id.*, 21-00812, p. 1, 378 So. 3d at 17. The majority opined that the cumulative effect of these ostensible errors warranted a new trial.

We granted the State's application for rehearing to reexamine our decision in *Robinson II*. *See State ex rel. Robinson v. Vannoy*, 21-00812 (La. 3/21/24), 382 So. 3d 27. After further review and careful consideration of the record, we find no merit to the claims raised in *Robinson II* and we erred in vacating defendant's conviction and sentence. We also considered the other issues raised by defendant in his writ application which were pretermitted in *Robinson II*, and find that the record lacks support for those claims as well.

On this basis, we vacate *Robinson II* and reinstate defendant's conviction and sentence. Our decision, to correct our earlier ruling, is not unprecedented. In *State v. Bridgewater*, 00-1529, (La. 1/15/02), 823 So. 2d 877, on reh'g (June 21, 2002), this Court initially found that evidence adduced at trial was insufficient to support the jury's verdict of first degree murder, but sufficient to support a second degree

2

murder conviction. The Court reversed itself on rehearing and agreed with the State that the evidence was "sufficient for the jury to convict [defendant] of first degree murder and impose a penalty of death by lethal injection." *Id.*, p. 8, 823 So. 2d at 909.[2]

## FACTUAL BACKGROUND

The facts of this case were detailed in *Robinson I* and *Robinson II*. However, we restate the salient facts of the case for the sake of clarity; additional detailed facts are included and addressed in our discussion of the various issues raised.

The murders for which defendant was convicted occurred at Lambert's home, located at 10 Guy Peart Road, approximately eight days after defendant came to live with Lambert. Lambert and defendant met while both were seeking treatment for alcoholism at the Veteran's Administration Medical Center. Lambert invited defendant to live with him upon his discharge in exchange for defendant's performing chores on Lambert's farm. Shortly after he began living at Lambert's home, defendant began drinking alcohol again. According to Lambert's cousin, David Peart, on the night before his death, Lambert told him that he intended to kick defendant out of the house and send him back for further treatment.

On the morning of the murders, around 8:30 a.m., defendant purchased a bottle of vodka at a nearby convenience store, Town & Country, located about a half-mile from Lambert's home. By 9:00 a.m., defendant was back at Lambert's house, as evidenced by the following. Lambert's aunt, Sybil Hackney, had died of a heart attack that morning. At approximately 9:00 a.m., Andrew Dunn, who was

---

[2] Other examples of cases in which this Court has reversed itself on rehearing include: *Bienvenu v. Defendant 1*, 23-01194 (La. 6/12/24), 386 So. 3d 280; *In re Reggie*, 95-0225 (La. 5/25/95), 655 So. 2d 320, 320-21; *State v. Shapiro*, 431 So. 2d 372 (La. 1982), *State v. Lewis*, 427 So. 2d 835 (La. 1982).

As one court observed, "the procedural mechanism afforded by the motion for reconsideration seeks to balance the need for finality in judicial decisionmaking with a recognition that courts sometimes make mistakes." *Karr v. Castle*, 768 F.Supp. 1087, 1093 (D. Del.1991), aff'd sub nom. *United States v. Carper*, 22 F.3d 303 (3d Cir.1994).

3

present at the Hackney home, called to notify Lambert of Sybil's death. Lambert did not answer the phone. Defendant did.

Hooper, Kelly and baby Nicholas were also at the Hackney home that morning, when Helen Hackney, Sybil Hackney's daughter-in-law, arrived at 10:00 a.m. According to Helen, around 11:40 a.m., Hooper, Kelly and baby Nicholas left to go to Lambert's home, a two-to-three minute drive from the Hackney home.

Meanwhile, between 11:00 a.m. and 11:30 a.m., Donald Ponthieux saw Lambert's truck at a grocery store located across the street from his father's business and noticed that Lambert was not its driver.[3] When Ponthieux saw the truck leave the grocery store parking lot, it headed in the direction of Lambert's home.

At approximately 12:10 p.m., Lambert's cousin, Doris Foster, arrived at his home, having previously made plans to have lunch with Lambert, Hooper, Kelly and baby Nicholas. Foster parked her car next to Lambert's truck, approached the house and peered inside through a window. She observed Hooper lying on the floor and assumed she had had a heart attack. Foster then discovered the door to the house was uncharacteristically locked, returned to her car and obtained the house key.[4] She went back, unlocked and opened the door, and "saw all of them" on the floor of the living room. When she then heard a noise in the house, she left quickly and drove to the Town & Country for help. A clerk at the store called 911 at 12:16 p.m. A short time later, when Foster returned to Lambert's house with first responders from the volunteer fire department, Lambert's truck was missing.[5]

Witnesses saw Lambert's truck fleeing the scene shortly after Foster had gone for help. Gary Normand, a tree trimmer for CLECO was working on Highway 1,

---

[3] Ponthieux's father owned an automobile salvage business. Lambert, who had worked as an insurance adjuster, would visit the business to adjust "wrecked cars" every two weeks. Accordingly, Ponthieux was familiar with Lambert's truck.

[4] Several witnesses, including Foster, indicated that Lambert never locked his doors. This suggests that the door was locked by the murderer.

[5] The volunteer fire department is located next door to the Town & Country.

"about a hundred yards from Guy Peart Road." He testified that he took his lunch break (which "doesn't take long") around 11:55 a.m. "[A]s soon as [he] got through eating," he heard "a truck spinning its tires" and saw a light-colored brown 1985 or 1986 Ford truck, consistent with Lambert's truck, coming from the direction of Guy Peart Road. Normand's boss arrived shortly after, at which time Normand looked at his watch and noticed it was 12:15.

Farel Scallan was having lunch in the main barn of the "Echo Ranch" located on the same road as Lambert's home, when he heard a "truck take off." It "sounded like the truck was in third gear and floored all the way going as fast as it possibly could." It was being driven erratically, swerving, hitting the ditch on both sides of the road and almost striking a telephone pole. Scallan estimated the time as a few minutes before 12:25 p.m.[6]

A third witness, Michael Poole, was returning to his home from lunch, when he encountered a truck coming toward him. He testified that the truck "had gone off the road . . . and come back and . . . came over on my side of the road and . . . he was fixing to hit me head on." Poole "jerked" his steering wheel but did not avoid the truck altogether as it side-swiped him, causing him to run into a ditch.[7] Poole drove out of the ditch, turned around and began to pursue the truck. He caught up with the truck and then motioned to a friend, Steve Halbert, to follow him. Lambert's truck then stalled and Poole walked over to it, seeing its driver "steadily cranking on the truck trying to get it cranked." When Poole threatened to call the police, the driver's "facial expression just . . . stopped" and the driver "just looked at [him]" and "got to [c]ranking on that truck." Poole found the driver to be "just as

---

[6] Scallan explained that he always set his watch five to ten minutes fast. So, when he looked at his watch after observing the truck, and it read 12:25 p.m., this meant it was actually five to ten minutes before the time displayed.

[7] According to Steve Wilmore, a detective with the Rapides Parish Sheriff's Office ("RPSO"), this hit and run with Poole occurred approximately 11.1 miles from Lambert's home.

nervous as I didn't know what." The driver restarted the truck and drove off with Halbert in pursuit, while Poole went to his mother's house to call 911. Halbert observed the truck pass other vehicles, go into oncoming traffic, run other vehicles off the road, and drive off the road during his pursuit.

The truck eventually turned onto a gravel road and plowed through a fence. The driver abandoned the vehicle and fled into a nearby wooded area. Police searched the area and found defendant, the driver, crouching behind a mound of dirt.[8] Defendant was apprehended between 2:15 and 2:30 p.m., and blurted out: "I'm not armed. I don't have a gun." While being handcuffed, he also stated: "I'm on medication for violent tendencies."

The arresting officers conducted a pat-down of defendant and recovered a number of items, including cash, a knife (later identified as belonging to Lambert) and a pack of Marlboro Lights cigarettes (a brand Lambert smoked). A spot of baby Nicholas's blood was later detected on the sole and one shoelace of defendant's left shoe.[9]

The police collected other evidence from the Lambert house. Among the items collected was a towel with a blood stain of baby Nicholas recovered from the floor of Lambert's bedroom and Lambert's empty wallet, found in defendant's bedroom.

## PROCEDURAL HISTORY

Defendant was indicted by a grand jury on four counts of first degree murder. He was tried by a jury from March 3, 2001 through March 12, 2001, found guilty of

---

[8] The eyewitness testimony thus establishes that defendant left in Lambert's truck some time between the time that Foster left the Lambert house to call 911 (having arrived around 12:10) and 12:15 when Normand saw Lambert's truck coming from the direction of Guy Peart Road. Therefore, only a few minutes elapsed from when Foster left the house and defendant fled in Lambert's car.

[9] Defendant's post-conviction expert in bloodstain pattern analysis, Stuart James, testified at the hearing that these stains on defendant's shoe were "transfer stains written in [his notes] to show that blood was transferred from an object, presumably a floor or flat surface that was stepped in when the blood was still wet." However, no footprints were found at the scene.

all charges, and sentenced to death. His conviction became final when the United States Supreme Court denied certiorari in 2004. Defendant then sought post-conviction relief. On March 31, 2020, following a ten-day evidentiary hearing (hereafter sometimes referred to as "the hearing"), the trial court found no merit to any of defendant's claims and denied defendant post-conviction relief. The trial court issued lengthy written reasons for its judgment. As explained above, the matter is now before this Court on rehearing.

## BURDEN OF PROOF

The burden of proof in a post-conviction proceeding "is entirely on the petitioner." *State ex rel. Williams v. State*, 15-1073, p. 1 (La. 4/22/16), 195 So. 3d 433, 434; *see also*, La. C.Cr.P. art. 930.2.[10] The State has no burden to prove anything in a post-conviction relief setting.

We review a trial court's ruling on an application for post-conviction relief for an abuse of discretion. *See State v. Henry*, 20-0412, p. 13 (La. App. 4 Cir. 10/29/20), 307 So. 3d 249, 257.

## LAW AND DISCUSSION

We begin our analysis with the claims upon which this Court relied to set aside defendant's conviction and sentence in *Robinson II*: alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. People of the State of Illinois*, 360 U.S. 264 (1959). We thereafter address the remaining claims pretermitted by the Court in *Robinson II*.

### *Alleged Brady violations*

The United States Supreme Court, in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), established the rule that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either

---

[10] La. C.Cr.P. art. 930.2 states: "The petitioner in an application for post conviction relief shall have the burden of proving that relief should be granted."

to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The prosecution's duty to disclose favorable evidence applies to both exculpatory and impeachment evidence. *State v. Kemp*, 00-2228 (La. 10/15/02), 828 So. 2d 540, 545; *see also*, *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is exculpatory when it "tend[s] to establish the defendant's innocence." *State v. Eley*, 15-1925, p. 11 (La. App. 1 Cir. 9/16/16), 203 So. 3d 462, 473. *Brady* likewise requires the disclosure of evidence "which impeaches the testimony of a witness when the reliability or credibility of that witness may be determinative of guilt or innocence." *State v. Bright*, 02-2793, p. 5 (La. 5/25/04), 875 So. 2d 37, 41.

To determine whether the prosecution's suppression of evidence violates due process under *Brady*, the evidence must be "material" to either guilt or punishment. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court explained: "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682); *see also*, *State v. Marshall*, 94-0461 (La. 9/5/95), 660 So. 2d 819, 826 (quoting *Bagley*, 473 U.S. at 682) ("A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."). A *Brady* violation is proved "by showing that the [withheld] favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435; *State v. Brown*, 15-2001, p. 2 (La. 2/19/16), 184 So. 3d 1265, 1266.

Defendant maintains the State breached its *Brady* obligations. He alleges it did so by withholding favorable evidence, including the following: a deal between the State and jailhouse informant Leroy Goodspeed in exchange for his testimony; handwritten notations on transcripts of interviews with witnesses; certain serology

8

records; certain records pertaining to ballistics and ballistics investigations; investigative materials reflecting a consultation with a psychic; and information obtained from eyewitnesses that was inconsistent with their trial testimony.

We have carefully reviewed the record and we now find no abuse of the trial court's discretion in determining that defendant failed to establish any *Brady* violations. First, a close review of the record reveals no evidence of a deal between the State and Goodspeed to secure his testimony prior to trial, even though a majority in *Robinson II* inferred one. Second, the State did not violate defendant's due process under *Brady*, as the allegedly undisclosed forensic and investigative records and information are not material to his guilt or innocence.

We now address the various individual pieces of evidence upon which defendant relies in support if his *Brady* claim.

### *Leroy Goodspeed's testimony*

Leroy Goodspeed was arrested in Rapides Parish in October 1997 and jailed at the Rapides Parish Detention Center in a cell with a number of other inmates, including, for a period of time, defendant. According to the center's warden, Vernon Creecy, Goodspeed and defendant were in the same cell from October 29, 1997 through November 17, 1997. On or about November 11 or 12, 1997, Goodspeed and defendant attended a religious service and conversed afterwards. During this conversation, Goodspeed asked defendant why he was in jail and defendant initially stated that he did not want to say anything on the advice of his lawyers.

Eventually, defendant disclosed to Goodspeed he had a drinking problem and had "been in blackout before." Defendant then discussed feeling remorseful, and confessed that he "did those people," mentioning "a man, two women and a small child." He also stated he had thrown a gun off a bridge.

Goodspeed was bothered by his conversation with defendant and related it to his wife, Becky Goodspeed, an hour later. Becky then contacted the authorities and

9

Goodspeed repeated the conversation a couple of days later to two detectives who came to see him. Defendant's attorneys visited Goodspeed on several occasions prior to trial. Goodspeed testified he gave them the same account of his conversation with defendant and told them "[their] client said he did those people."

Goodspeed was questioned extensively at trial about his motivations for testifying and repeatedly indicated he was "telling the truth" and felt it was "the right thing" to do. He was specifically asked whether he was offered anything by the State or received anything in exchange for his testimony; Goodspeed categorically denied both accusations. He repeatedly stated that nothing was offered to him and he did not ask for anything.

Goodspeed was thoroughly cross-examined about his extensive past drug use, his history of arrests, and his mental stability as reflected in psychiatric testing. He conceded that, at times, when he needed something, he could be "deceitful and manipulative." He further admitted he "lied a few times in [his] life." He likewise admitted not "want[ing] to stay in jail for a long time" and he "hate[d] being in jail with a passion." When asked whether he "wanted to think of a way that might help get him out of prison," he candidly stated, "yes, sir. I guess you're right." The jury had all of this information when it weighed Goodspeed's credibility.

In post-conviction, defendant maintains the State violated *Brady* by failing to disclose that Goodspeed testified in exchange for certain benefits.[11] Defendant points to undisclosed evidence he discovered after trial in an effort to substantiate his claim that Goodspeed obtained benefits from the State before he testified and that he was further incentivized to testify against defendant by promises of future benefits. He cites the following as some of the evidence of those benefits of which he was unaware:

---

[11] Goodspeed did not testify at the post-conviction hearing as he died in 2016.

*Alleged evidence of pre-trial benefits:*

- In February, 1998, Goodspeed entered into a plea agreement in Rapides Parish for charges against him; although he faced a possible sentence of 33 year, he received three years imprisonment at hard labor with one year suspended, and ultimately served 11 months.[12]

- Prior to defendant's March 2001 trial (in January 1999 and in February 2001), Goodspeed received two pardons for which he was not eligible;

- Goodspeed's probation officer, Scotty Melancon, wrote a letter on December 18, 2000 to Judge Ross Foote in Rapides Parish advising that Goodspeed had been arrested in Lafayette Parish and charged with being a principal to first degree robbery (noting, too, that he was on probation), recommending no action be taken at that time.

*Alleged evidence of promises of post-trial benefits:*

- A January 28, 1998 transcribed statement of Goodspeed's wife, Becky Goodspeed, contained (undated) handwritten notes that were redacted when produced to defense counsel; the redacted note is somewhat obscured but appears to state: "try and reconcile . . . said this may help you to get out Det[ention];"

- In May 2001, Rapides Parish district attorney Michael Shannon (lead prosecutor on defendant's case) left messages for an assistant district attorney in Lafayette, Luke Edwards, and in response, Edwards sent a five-page fax to Shannon in June 2001 noting "Per your request Leroy Goodspeed" (only the transmittal page was ever located; the contents of the fax are unknown);[13]

- Edwards obtained a continuance in Goodspeed's first degree robbery case on June 19, 2001. That same day, Goodspeed wrote a note to the supervising officer at the Lafayette Parish Correctional Center stating: "Dear Sir Would you please check and see if I have any hold's [sic] or warrents [sic] on me. I went to court and the DA is going to give me time served on 8-13-01. I should go home that day. 'Just making sure nothing stop's [sic] me at that time;'"

- On August 13, 2001, the State dismissed the first degree robbery charge pending against Goodspeed;

- An October 25, 2001 note to another Lafayette assistant district attorney, Thomas Frederick, indicated that assistant district attorney Edwards

---

[12] This particular information was presented at defendant's trial in 2001.

[13] Defendant takes the position that there was a "flurry of communications between Shannon, ADA Luke Edwards, and ADA Thomas Frederick, resulting in dismissal of all felony charges against Goodspeed – the culmination of his deal with the State." The documents cited in support of this argument are three handwritten phone messages from May 2001 requesting "Luke," the Lafayette Parish prosecutor, return calls from Shannon. One of the three messages has Goodspeed's name on it. Importantly, all messages were dated two months after defendant's trial. Moreover, none hint at the existence of a *pre-trial* deal with Goodspeed.

requested he dismiss a "Check charge," explaining that "Mr. Goodspeed was an essential witness in a murder trial;"

- A charge of issuing worthless checks was dismissed by assistant district attorney Frederick on November 6, 2001;

- Goodspeed allegedly made statements to post-conviction investigator, Susan Herrero, who testified at the post-conviction hearing that he reported having received a deal on his Lafayette charges in exchange for his testimony against defendant.[14]

- Goodspeed allegedly made statements to a former cellmate, Kevin Nichols, who testified at the post-conviction hearing that immediately after Goodspeed testified at defendant's trial, he returned to the cell "really mad 'cause they incriminated" him and he worried that "it messed his deal up" as far as Nichols "could understand."[15] It was Nichols's understanding that Goodspeed had a deal to testify at defendant's trial and Nichols testified that it "sounded . . . [like] it had already been done."[16]

Based on the foregoing, defendant contends, Goodspeed received benefits from his testimony and the State withheld information about those benefits. Defendant was unaware of those benefits at trial and thus, was deprived of information with which he could have impeached Goodspeed.

These arguments were rejected by the trial court after the hearing. In its Written Reasons for Judgment, the trial court alluded to the jury's having been provided with information challenging Goodspeed's character and credibility. For example, it noted Goodspeed's admission "that he would do everything in his power

---

[14] Notably, Goodspeed did not tell Herrero that he had a deal with the State *before* he testified, only that he received a deal *after* he testified. In his conversations with Herrero, Goodspeed only referenced "the Lafayette prosecutor's file," which he believed contained a letter "that went into that file on his behalf, in exchange for his testimony." That "letter" could only be the October 2001 request that the check charge be dismissed; no other "letter" was found.

[15] Nichols was a witness for the State at defendant's trial. He testified that he had been jailed with defendant for about two weeks in January 2001, and came to the attention of the prosecutors after sending them a letter. At defendant's trial, Nichols testified that he spoke with defendant about weapons, noting that defendant was "really intelligent about weapons." Nichols asked defendant if he hunted deer or ducks and defendant's response was, "no. I just hunt people." Nichols believed defendant was referring to his military service.

At defendant's trial (where he testified after Goodspeed), Nichols did not mention anything about Goodspeed being upset after testifying and worrying about a deal he purportedly made. Nichols first reported his alleged conversation to members of the defense team around 2010 and 2014, he signed a "declaration." In it, Nichols stated that Goodspeed "said the prosecutors was [sic] supposed to give him a deal on his case if he testified against [defendant]."

[16] Ironically, this Court is urged to reject "jailhouse testimony" on the one hand by believing it on the other.

to avoid being in jail." The jury also heard evidence that Goodspeed faced a possible sentence of thirty-three years, but received only a three-year sentence and was released after eleven months. The trial court observed there was "more detailed evidence [at the hearing] that appears to indicate Goodspeed *may* have been allowed special treatment." (Emphasis added). However, the trial court, noting that it was unknown "[w]hat weight, if any, the jury gave to his testimony," found:

> The value of Goodspeed's testimony was very low compared to the other evidence brought against [defendant] at trial . . . . The jury was presented with evidence of special treatment at trial, which defense counsel was able to use to impeach Goodspeed in its cross-examination. The only additional evidence now being brought by [defendant] is similar circumstantial evidence possibly showing further special treatment received at later dates following the trial. Therefore, it is unlikely that this information would have seriously undermined Goodspeed's testimony any more than the evidence heard by the jury at trial.

The record reflects no direct evidence supporting the claim that the State offered anything to Goodspeed in exchange for his testimony before trial. First, all witnesses who testified on the subject – including Goodspeed's own attorney, W.T. Armitage – strenuously denied the existence of any sort of "deal" with Goodspeed prior to defendant's trial. At trial, Armitage (who had been appointed to represent Goodspeed in 1997 for a number of charges in Rapides Parish), was called to testify about the February 1998 plea deal Goodspeed received. Armitage specifically testified that there was no discussion about Goodspeed being a possible witness at defendant's trial and, to his knowledge, the trial judge who accepted Goodspeed's plea was not aware of Goodspeed's involvement in defendant's (upcoming) trial.

Detective Wilmore, the RPSO detective who obtained Goodspeed's statement about defendant's confession, also testified at trial that he "never promised him anything" or indicated in any fashion that Goodspeed would get special treatment or assistance with his criminal charges by giving a statement implicating defendant.

13

Goodspeed never asked anything of him and Wilmore never heard that Goodspeed received favorable treatment as a result of his testimony.

At the post-conviction evidentiary hearing, Michael Shannon, the State's lead attorney at defendant's trial, was adamant that he never offered anything to Goodspeed to induce his testimony and Goodspeed never asked anything in exchange for his testimony. Consistent with his trial testimony, Goodspeed advised Shannon his testifying was simply "the right thing to do." Shannon did not know and has never spoken with Melancon, who is alleged to have contacted a judge on Goodspeed's behalf. Shannon further testified he had nothing to do with the disposition of a Rapides case against Goodspeed – he never spoke with nor asked any help of Armitage, nor the prosecutor handling those charges. He had no contact with them "because [he] told Goodspeed numerous times" he was not going to help him. Shannon did admit that he spoke with a Lafayette assistant district attorney about Goodspeed *after* defendant's trial, discussed more fully *infra*.

Ray Delcomyn, an investigator with the Rapides Parish District Attorney's office whose deposition was introduced at the hearing, indicated he "was there every time Mr. Shannon spoke with Mr. Goodspeed, whether it was in Lafayette or wherever." Realizing there would be an issue as to whether a promise had been made to Goodspeed, he ensured his presence at all meetings so "there was never an occasion where Mr. Shannon and Mr. Goodspeed were alone . . . I wanted to make sure that there was a party sitting there who would say, 'No, never heard any offers of help, promise to do anything at all.'" He confirmed Shannon's testimony that Shannon advised Goodspeed "there's no deals here up front." Goodspeed always responded he understood.

Second, the remaining evidence cited by defendant does not substantiate that a deal was made with defendant prior to trial.

Defendant cites the following evidence, all of which developed prior to defendant's trial: the two pardons documented in Goodspeed's Department of Corrections records, the February 1998 Rapides Parish plea deal, and the December 2000 letter from Melancon to Judge Foote. None of these items support the conclusion that there was an agreement with Goodspeed or, more importantly, refute the testimony of the only witnesses who directly testified on the issue (Shannon, Armitage, Wilmore, Delcomyn and Goodspeed) that there was no deal.

Defendant contends Goodspeed undeservedly received the two pardons to induce his testimony against defendant at trial. As defendant states in his brief, these pardons were "recorded in the State's CAJUN offender tracking system in 1999 and 2001" by "someone." Defendant's attorney, Michael Small, confirmed at the hearing he had "no idea how the pardons were entered into the" the system. Further, as defendant's witness, Jennifer Fontenette, a probation supervisor, testified, numerous individuals have access to the CAJUN system and can make entries. We disagree with defendant's argument that "it does not matter who fraudulently entered these pardons." There is no evidence as to how those pardons were entered into the system and we cannot assume the entries were *directed* to be entered as a *benefit* to Goodspeed to induce his testimony at trial. Pure speculation is required to find otherwise and would require a determination that the witnesses (Shannon, Armitage, Wilmore and Goodspeed) all committed perjury. Furthermore, there is no evidence Goodspeed even knew he had received these pardons or what tangible effect they had on any subsequent prosecution.

Similarly, as concerns the December 2000 letter from Melancon to Judge Foote,[17] we do not find it to create any inference that Goodspeed was offered

---

[17] The letter states, in full:

> The above-named offender [Leroy Goodspeed] appeared before Your Honor on February 2, 1998 in Ninth Judicial District Court, Parish of Rapides and entered a plea of guilty to Possession of Cocaine, Possession with intent to Distribute Cocaine, Theft, Simple Battery. He was sentenced to serve a term of three (3) years

something in exchange for his testimony. The letter does not reference any deal with Goodspeed and does not suggest any benefit to Goodspeed; it merely requests no action be taken at that time. This is an understandable request given Goodspeed was being held in jail in Lafayette and defendant's trial was to commence a month and a half later.[18] More importantly, the letter did not request the dismissal of pending charges, leniency or any other benefit to Goodspeed.

As to the remaining items of evidence upon which defendant relies in support of his claim, the record contains no evidence demonstrating any resulted from a pre-trial "deal" with the State.[19]

Goodspeed's wife, Becky, gave a statement to Wilmore on January 28, 1998, that was transcribed and printed. There is a handwritten note in the margin of a printout of the transcription of the interview; however, the copy of the transcript provided to defense counsel had the note completely obscured. The *Robinson II* Court quoted the margin note as "appear[ing] to state, in part 'try and reconcile… said this may help you to get out Det[ention]." *Robinson II*, 21-00812, p. 10, 378 So. 3d at 9. Defendant maintains this is "valuable impeachment evidence" that should have been disclosed, arguing that this statement gives "lie to Goodspeed's supposedly disinterested motive in coming forward to inculpate" defendant.

_____

at Hard Labor, said sentence suspended, and placed on three (3) years Active Supervised Probation with Special Conditions.

This is to advise Your Honor that the offender was arrested by the Lafayette City Police Department on December 14, 2000 on the charge of Principal to First Degree Robbery. The offender has been detained by Lafayette District and remains incarcerated at the Lafayette Parish Correctional Center as of December 19, 2000.

Lafayette District respectfully recommends that no action be taken at this time.

[18] As the *Robinson II* Court observed: "Melancon explained via deposition that he does not recall the details surrounding the issuance of the letter, but that it was not unusual to not recommend revocation when there is a pending charge, and 'apparently I chose not to recommend revocation, between my supervisor and I.'" *Robinson II*, 21-00812, p. 10 n.7, 378 So. 3d at 22.

[19] This include: evidence of communications between Shannon and Edwards in May 2021, the nature of which is completely unknown; the August, 2001 dismissal of first degree robbery charges against Goodspeed in Lafayette; the State's June, 2001 request for a continuance of his case; and the November, 2001 dismissal of charges against Goodspeed for issuing bad checks (discussed above).

We find no merit to this claim. First, it is not entirely clear what the obscured note says. Second, there is no evidence as to when it was written, why it was written, who wrote it, or to whom it was directed.[20] Without context, the note has little to no evidentiary value.[21] More importantly, there is nothing in this notation suggesting any offer by the State to Goodspeed for his testimony against defendant.[22] Again, the uncontroverted testimony of both Wilmore (at defendant's trial) and Shannon (at the hearing) is that neither made any promises to Goodspeed for his testimony. Nor do we find the handwritten notation to be material. There is no reasonable probability that, had an unredacted copy of Becky's statement been turned over, it would have produced a different outcome at defendant's trial. This evidence does not undermine confidence in the verdict as contemplated by *Kyles*.

We recognize the dismissals of the first degree robbery and the issuance of bad checks charges as clear benefits provided to Goodspeed. Such occurrences are routine in the criminal justice system, and indicative of nothing beyond the unique

---

[20] Wilmore did not testify at the hearing and there was no other testimony clarifying this information.

[21] The import of the notation requires pure speculation. For example, it could be seen to suggest a marital reconciliation; that if Goodspeed reconciled with his wife, this could help him "get out" of detention.

[22] In *Bell v. Bell*, 512 F.3d 223, 237 (6th Cir.2008), the United States Sixth Circuit Court of Appeals considered the failure of the prosecution to disclose notes taken during a meeting with a jailhouse informant which documented that the informant sought consideration in exchange for his testimony (later, four pending criminal charges were dropped against the informant and he received concurrent sentences on the remaining two charges). The Court observed that the notes "would have provided support for the defense theory that [the informant] expected some benefit in return for his testimony . . . and was therefore not a credible witness." *Id.*, 512 F.3d at 237. However, the Court found no reversible error, stating:

> The notes from [the informant's] meeting with [the prosecutor] could have bolstered [defendant's] credibility attack on [the informant's] motives, but any assistance would have been modest. The jury was apprised of [the informant's] status and the possible other reasons for his decision to testify, namely, that he wished to secure early parole as a result of his participation in the . . . case. Documentation would not have permitted the development of alternate theories or different lines of argument. Thus, the inclusion of the withheld material could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555.

> We conclude, therefore, that [the prosecutor's] notes from his meeting with [the informant] were not material, and the district court correctly denied relief on [defendant's] *Brady* claim.

*Id.*

facts and applicable law in each discrete and unique case. The fact that a witness who testified at a trial thereafter received benefits, even if they were imparted because of the witness's testimony, is insufficient to demonstrate a *Brady* violation. *See* footnote 23, *infra*. While the failure to disclose an express agreement whereby a witness receives benefits from the State for his testimony may warrant reversal of a resulting conviction, this requires a showing that in advance of trial, the State made such an agreement to secure the witness's testimony. A witness's subjective belief that he will obtain some advantage is insufficient.

In *State v. Williams*, 338 So. 2d 672, 677 (La. 1976), for example, this Court found no *Brady* violation when the prosecution did not disclose that a testifying witness received certain benefits, stating:

> . . . it was [not] shown that the prosecutor's action in nolle prosequing the burglary charge against [the witness] was negotiated in exchange for her testimony nor that she was otherwise promised anything . . . The fact that an unrelated charge has been dropped against a state witness, standing alone, does not offend defendant's right to due process, and, absent the additional showing that her testimony was bargained for, does not violate the proscription set down in *Giglio* and *Brady*.

*Id.*, 338 So. 2d at 677.

Similarly, in *Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004), the defendant alleged a witness received favorable treatment in exchange for his testimony. In support of his claim, the defendant relied on the affidavit of the witness's wife which stated that someone in the prosecutor's office assisted the witness in obtaining a lawyer and charges against the witness were dropped by the State. As the court observed, "[t]hese two facts, even if true, do not by themselves show that any type of agreement existed. Rather, Petitioner's claim rests upon a substantial degree of speculation." *Id.*, 371 F.3d at 281. Speculation "about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim." *Id.*; s*ee also*, *State v. Meyers*, 97-2584, p. 12 (La. App. 4 Cir. 11/24/99), 748

So. 2d 554, 562 (defendant failed "to provide any evidence, aside from the reduction of the charges against [a testifying witness] and the sentences that he then received after . . . trial, showing that [the witness] testified against [the defendant] pursuant to some sort of deal with the State.").[23]

There is no such evidence presented in this case. Although Goodspeed ostensibly received some benefits *after* trial, there is no evidence that the State entered into a deal with Goodspeed *before trial* to obtain his testimony against

---

[23] Other courts have also held the mere fact that a witness who testified at a trial received benefits is insufficient to demonstrate a *Brady* violation; it must be shown the benefits were received in exchange for the testimony. *See*, *e.g.*, *State v. DuBray*, 317 Mont. 377, 396; 77 P.3d 247, 261 (2003) ("While it is true that [the witness] may have benefitted from the State's decisions regarding his criminal endangerment charge and his probation violation, no evidence exists which indicates that the benefits *were given in exchange for information*. . . . Moreover, at trial, [the defendant's] counsel took the opportunity to cross-examine [the witness] about what he had to gain by cooperating with the State. The facts here do not give rise to a violation under *Brady*.") (Emphasis added).

*See also*, *Lewis v. Davis*, 2018 WL 4024811, at *159 (E.D. Cal. Aug. 20, 2018), *aff'd sub nom. Lewis v. Andes*, 95 F.4th 1166 (9th Cir. 2024) (despite much evidence of leniency to a witness - (1) a three-year sentence on a receipt of stolen property charge was suspended and never imposed notwithstanding the witness's "noted subsequent criminal violations;" (2) an arson charge "was dismissed on favorable terms following a no-bail release notwithstanding issuance of bench warrants for failure to appear;" (3) a three year sentence imposed on a cocaine charge was suspended and never imposed, and (4) "a sixteen month sentence imposed on a commercial burglary charge was the low-end term and was imposed only after [the defendant's] proceeding was concluded" – the court found no *Brady* violation, noting that the witness "testified at trial that no one had told him he would be helped in these regards or as to his pending matters if he testified for the prosecution . . . . He acknowledged his noted criminal background and pending proceedings and at that time denied any prosecution benefit . . . . [T]he California Supreme Court reasonably found Petitioner had not demonstrated these noted dispositions were benefits [the witness] received in exchange for his testimony in Petitioner's proceeding."); *Shabazz v. Artuz*, 336 F.3d 154, 163-165 (2d Cir. 2003) ("The witnesses' 'general and hopeful expectation of leniency is not enough to create an agreement or an understanding' that they would, in fact, receive leniency in exchange for their testimony . . . . "[P]etitioner is correct that [witnesses] received a benefit because they testified against him. However, this fact, standing alone, does not establish that, prior to petitioner's trial, the District Attorney's Office promised [the witnesses] leniency. The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony.") (emphasis supplied); *Abdus-Samad v. Bell*, 420 F.3d 614, 625 (6th Cir. 2005) (although district attorney made a recommendation for the witness after he testified, defendant "failed to establish that a parole recommendation of this sort is highly unusual without there having been a prior deal in place between the State and the witness."); *Williams v. Coyle*, 260 F.3d 684, 707 (6th Cir. 2001) (upholding district court's finding that no deal existed between prosecutor and witnesses prior to trial and that post trial events—one witness pleaded guilty to a lesser-included offense and received a suspended sentence, and another witness serving a one-year sentence was allowed to vacate his plea and plead to a lesser-included offense and received a suspended sentence and probation—were not evidence that a deal existed prior to the witnesses' testifying); *U.S. v. Molina*, 75 F.3d 600, 602 (10th Cir. 1996) ("The mere fact that the witnesses were subsequently allowed to plead on favorable terms is not evidence that the plea agreements were secretly reached prior to the witnesses' testimony and improperly withheld from the defense.").

defendant. Again, to find otherwise would be to implicitly find that the witnesses – Shannon, Armitage, Wilmore, Delcomyn and Goodspeed – all committed perjury.

Accordingly, we find the Court erred in *Robinson II* when it found the State violated *Brady* by "failing to disclose subsequent documents requesting dismissal of Goodspeed's pending charges in Lafayette Parish because he has served as an 'essential witness' at a murder trial." *Robinson II,* 21-00812, p. 41, 378 So. 3d at 40. These documents did not exist at the time of defendant's trial and, importantly, do not evidence the existence of a deal *before* defendant's trial.

Defendant also presented testimony from Herrero and Nichols, both of whom indicated Goodspeed told them he received a deal for his testimony.[24] Again, Goodspeed's subjective belief that he had a deal with the prosecution in exchange for his testimony (something he expressly denied at trial) is not sufficient to support a *Brady* violation. Moreover, other facts belie defendant's alleged post-trial statements that he believed he would receive benefits from testifying at trial.

First, Small, one of defendant's attorneys, testified at trial that Goodspeed called him in July 2000, and asked that he come to see him. On July 31, 2000, some six months prior to defendant's trial, Small met with Goodspeed. Goodspeed reportedly advised Small about the amount of money he needed to bond out of jail, and stated: "[i]f enough money ends up in my account for me to post bail, no one involved in Darrell Robinson's case will have to worry about Leroy Goodspeed." Small, believing Goodspeed was trying to bribe him, responded that this was unethical and illegal and he would "have no part in it."[25] Small left Goodspeed, went to his car and immediately memorialized this conversation with his dictation recorder.

_____

[24] According to Herrero, Goodspeed told her he had "gotten a deal with Mike Shannon."

[25] This information was presented to the jury and further called Goodspeed's credibility into question.

20

Second, approximately two months after trial, Shannon's nephew, who had been housed in a halfway house with Goodspeed, asked Shannon to "put in a good word for him." Around the same time, Goodspeed also called Shannon directly and asked that he "put in a good word for him."[26] Coupled with Goodspeed's insinuation to Small prior to trial he would "disappear" if he had sufficient funds to make bond, these requests for assistance undercut the argument that Goodspeed believed the State had already promised him benefits for his testimony.

As the trial court found, there was ample evidence admitted at trial to discredit Goodspeed. In an analogous case, the Fourth Circuit Court of Appeal observed:

> . . . the defendant alleges his *Brady* rights were violated by the State's failure to disclose exculpatory evidence of the plea deal the State made with Mr. Dominick in exchange for his trial testimony . . . . Mr. Dominick testified at trial that he was not offered nor did he believe he would be offered a deal in exchange for his testimony. The defense presented a scathing cross-examination of Mr. Dominick reviewing details of his pending prosecutions, his understanding of the State's authority to reduce or dismiss charges and every interaction Mr. Dominick had with prosecutors since the inception of his criminal prosecutions.
>
> The prosecutor informed the court that the District Attorney's Office never offered Mr. Dominick any deals.
>
> Even Mr. Butler, the attorney representing Mr. Dominick in the criminal matters pending against him at the time of this trial, testified that he asked the prosecutors on several occasions if Mr. Dominick would receive any consideration in his criminal prosecution in exchange for his testimony in this case. Mr. Butler maintained that the prosecutors flatly refused his requests on every occasion and that Mr. Dominick testified at this trial against his advice.

---

[26] According to Shannon, he looked into the charges pending against Goodspeed at the time, one of which was first degree robbery, which was a "serious charge" for which he would not have helped him. Not knowing "how aggravated this crime was" and whether he "wanted to put in a good word for him or not," Shannon requested copies of all police reports. He discovered the charge resulted from Goodspeed (and another individual) trying to buy drugs from "another druggie" and not paying for them. Because of this, Shannon felt this was not "a real serious thing" and, "under those circumstances, [he] could make a request." He further testified Goodspeed had undergone "twelve, fifteen hours of brutal cross-examination" and so, he "kind of felt for the man," and thought Goodspeed "had always been honest." He thus called the prosecutor, Edwards, and stated: ". . . look, it doesn't look like a real serious thing. If y'all - if y'all can find a way to assist him, I would appreciate it. He was a material witness in a murder case."

*State v. Henry*, 13-0059, pp. 26-27 (La. App. 4 Cir. 8/6/14), 147 So. 3d 1143, 1159.

We are also guided by Supreme Court's acknowledgement in *Smith v. Cain*, 565 U.S. 73, 76 (2012), that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." In *Smith*, the eyewitness testimony was material because it was "the only evidence linking [the defendant] to the crime." *Id*. (Emphasis supplied). Similarly, the *Medellin* Court found:

> Even if Petitioner could establish . . . that the government suppressed a deal to drop the charges against [the witness], Petitioner nonetheless fails to show that this information is material *in light of the overwhelming evidence establishing his guilt*. The district court correctly emphasized that "substantial and convincing evidence" of Petitioner's role in the murders existed even without the [the witness's] testimony.

*Id*., 371 F.3d at 281. (Emphasis added).

Here, there was sufficient other evidence upon which defendant's conviction was based. This conclusion was unanimously acknowledged in *Robinson I*, 02-1869, p. 9, 874 So. 2d at 75: "[t]he circumstantial evidence presented at defendant's trial excluded any reasonable hypothesis of his innocence." We therefore find defendant received a fair trial resulting in a verdict worthy of confidence. As the trial court observed, Goodspeed's testimony was "but a minor piece of the larger puzzle."

*Kyles* instructs that the ultimate question is whether there is a reasonable probability that, had all of the favorable evidence been disclosed to the defense, the result of the proceeding would have been different. In other words, whether in its absence, defendant received a fair trial, resulting in a verdict worthy of confidence. We find defendant failed to demonstrate the requisite "reasonable probability" the outcome of his trial would have been different had he known about: the two pardons entered into the CAJUN system, or Melancon's letter to Judge Foote recommending

no action against defendant at the time. Further, the remaining evidence arising after trial simply does not substantiate the existence of a deal between the State and Goodspeed *before trial* sufficient to warrant the reversal of defendant's conviction. Necessarily, none of this evidence existed before defendant's trial. The State could not have violated *Brady* by withholding evidence that did not exist.

### Serology notes, other documents from the North Louisiana Crime Lab ("NLCL")

In his post-conviction application, defendant argued that he was not provided with the NLCL's complete file in connection with a red jacket that was hanging from a doorknob in the hallway adjoining the room where the victims were shot. The jacket was stained in various locations with blood. Pre-trial testing excluded defendant and all of the victims as the source of the blood stains. This information was turned over to defendant and the jacket was examined by defendant's own expert before trial.[27]

The trial court agreed with defendant's post-conviction claim that some of the documents relating to this evidence had not been provided to him before trial. However, the trial court's judgment is not clear as to precisely which documents it found to be withheld. Even assuming all the records were withheld, we find the information the records contained was not material to defendant's guilt or sentence. It is not even clear the withheld information is of sufficient evidentiary value to be deemed favorable. As explained below, the trial court did not abuse its discretion in denying defendant's *Brady* claim with respect to this evidence.

The withheld NLCL records show that the jacket bore "high velocity impact spatters." These spatters were never attributed to any particular person as they were insufficient for identification. It is defendant's position "the high velocity blood

---

[27] More recent testing of the blood stains, conducted in 2018 by Sorenson Forensics, matched some of the blood stains to Mark Moras, who had lived with Lambert in the past.

spatter on the jacket indicated it was worn in close proximity to the shootings that killed the four victims" and thus "ties the red jacket and the third-party blood found on the jacket to the homicides." He asserts this is evidence someone other than defendant and the victims was present at the time of the murders and supports his theory of an alternative perpetrator.

Defendant further alleges the State had likewise recognized this fact, as evidenced by a July 20, 1998 letter from Delcomyn (the District Attorney's Office investigator) to the RJ Lee Group (the company that conducted gunshot residue testing for the State), wherein he mentions this high velocity spatter:

> . . . In addition to the clothing items that you have received as of this date, the Sheriff's Dept. is also sending a red jacket. Let me explain the significance of this jacket.
>
> The crime lab has reported finding high velocity blood spatters on the sleeve areas of this jacket. The blood contained in these high velocity spatters was insufficient for an identification. However, two other spots of blood were noted on the jacket, and this blood does not match the defendant or any of the victims. Please examine this jacket for any gunshot residue.

Defendant contends the letter "explains clearly, in the State's own voice, that the high velocity blood spatter and third party blood on the red jacket are 'significant'" and "could have been used alone, or in conjunction with the Serology Notes, to impeach the State's forensic witnesses and buttress the argument that someone else committed the homicides."

At the evidentiary hearing, defendant's expert in bloodstain pattern analysis, Stuart James, agreed "there is no way that you can date when any of that [blood] spatter got" on the red jacket. Curtis Knox, who worked for NLCL as a forensic scientist confirmed there is no way to "age" a blood stain and no way to determine when a stain was left. It is thus completely unknown when any of the blood stains

24

were deposited on the jacket. The investigator's use of the word "significance" in the letter does not alter this conclusion.[28]

Defendant also relies on an undisclosed photograph of a drip mark on the wall above where the red jacket was found hanging. He maintains that "the high velocity blood spatter on the jacket indicated it was worn in close proximity to the shootings that killed the four victims, and the unidentified drip stains thus likely belonged to the true killer." Defendant's argument presumes the drip on the wall is blood that was deposited during the murders. We recognize James testified at the hearing that, in his opinion, "some blood stains on the red jacket and [a] passive drip stain on the wall were most likely part of the same blood – blood stain event."[29] He explained that, based on the "angularity of [the drip on the wall], . . . it came from above and struck at an angle, that was very close to the red jacket."

The drip stain on the wall was never tested and therefore was never matched to the blood on the jacket (or to anyone, for that matter). Moreover, as it was untested, there is nothing in the record confirming the stain was, in fact, a blood stain. Other than its proximity to the jacket, James offers no compelling explanation for his opinion that it is related to the jacket. Given the jacket had blood stains on the front, back, sleeves, and inside lining, Mr. James' opinion in this regard is pure speculation.

---

[28] Although defendant repeatedly emphasizes the use of the term "significance" in Delcomyn's letter, defendant fails to show how that term, or any of the letter's content, is favorable to him as contemplated by *Brady*. He further fails to show any manner by which the letter could be used as impeachment evidence. The "significance" to which Delcomyn refers is that the high velocity blood spatter could not be identified and/or other blood found on the jacket did not match the victims or defendant, the latter of which was known to all parties. And, as we have already determined, the high velocity blood spatter has not been connected to the murders. It follows that the reference to it in Delcomyn's letter is neither impeachment nor exculpatory evidence. More importantly, the letter does not seek any testing or other information from the RJ Lee Group concerning the blood stains on the jacket. The only request is that the jacket be tested for gunshot residue.

[29] James testified on cross-examination that the blood spatter on the outside of the jacket's left sleeve was deposited on the jacket prior to the jacket's being hung on the door handle, given that the sleeve was inside out when it was left. Owen McDonnell, an expert for the State, agreed.

Without any manner by which to determine to whom the blood spatter stains belong, or when and how those blood stains were deposited, any attempt to link those blood stains to the murders, and any attempt to use the blood stains to establish who the "true killer" was, requires pure conjecture. The fact that *some* unidentified blood stains found on the jacket were determined to be high or medium velocity is simply not material or relevant to the murders. Accordingly, we find any failure of the State to produce all of the serology bench notes did not violate *Brady*. To the extent it is now known some of the other stains on the jacket belong to Moras, this is information the State did not possess and could not have provided to defendant at the time of trial.[30] This information cannot be deemed *Brady* material.

We are also not persuaded by defendant's argument that he could have used the existence of the high and medium blood spatter stains as impeachment evidence had he had the full serology notes. Defendant points to the testimony of David Peart, who was called by the State, and who identified the red jacket as one Lambert often wore when they worked together on the farm. Peart testified that he and other workers on the farm would occasionally cut themselves on barbed wire. Defendant argues Peart's testimony implied the blood on the jacket was the result of an accident on the farm, and not from the murders. Defendant's attorney, Small, testified at the hearing he would have used the information that there were high and medium velocity impact blood spatter on the jacket, as well as the blood drip on the wall, to impeach Peart's testimony by showing the blood was deposited on the jacket during the murders. We find no merit to this argument. As we have already found, there is nothing about these stains, or any stain on the jacket, which ties the jacket to the murders or the timeframe of the murders. As such, these stains cannot be considered impeachment evidence.

---

[30] The identity of Moras as the source of some of the blood stains is addressed in defendant's actual innocence claim, *infra*.

The red jacket is a red herring. This is true for a number of reasons. First, regardless of the source of the blood, there is nothing to indicate who, if anyone, was wearing the jacket at the time of the murders. Second, the State had the burden of proving the defendant's guilt beyond a reasonable doubt, not to prove the absence of guilt of anyone else. Even if someone else was culpable in the murders, this would not exonerate defendant of his guilt. Finally, if, as defendant asserts, the unidentified spot on the wall above the jacket was blood, then it is more likely than not that the jacket was hanging on the doorknob at the time the blood attached. This means no one would have been wearing the jacket at the time of the murders, and that fact would neither implicate Moras nor exonerate defendant.

Upon careful review, we find error in this Court's conclusion in *Robinson II* that the serology records are exculpatory, material evidence that "supports defendant's theory of the case, *i.e.*, that an unidentified person who was neither defendant nor one of the victims was present and involved in the murders." *Id.*, 21-00812, pp. 27-28, 378 So. 3d at 32.

### Ballistics evidence

Defendant maintains the State further violated *Brady* by failing to produce certain records pertaining to ballistics and firearms, citing the following: photographs of ricochet marks in the living room, differing angles and views of the victims and the bedrooms; various ballistics-related bench notes; crime scene sketches; and other materials related to ballistics testing and analysis performed by NLCL. Defendant argues these materials "were critical to reconstructing the crime scene and understanding what happened during the homicides." The trial court's conclusion as to which of these records was withheld is not clear. Regardless, as we found with the serology notes, even if all of the claimed records were indeed withheld, we find the allegedly omitted evidence is not material to defendant's guilt or sentence because it does not support "a reasonable probability that, had the

27

evidence been disclosed . . . , the result of the proceeding would have been different," as required by *Kyles*.

In support of his argument that the State violated *Brady* with respect to the ballistics evidence, defendant cites the testimony of his expert in firearms and ammunition, John Nixon. After reviewing the evidence defendant alleged had not been produced, Nixon reached the following opinions: there were at least three different types of bullets at the crime scene; it is likely more than one firearm was used to commit the murders; there were at least six shots fired at the time of the murders (contrary to the State's position that there were only five shots); and there were likely two shooters. Defendant contends that, had the unproduced evidence been provided prior to his trial, he could have challenged the State's theory of the case (that only five shots were fired and that the crime was committed by one person alone) and provided an alternate explanation of the crime.

Although Nixon opined that the different bullets demonstrate there was more than one shooter involved in the murders, he offers no compelling explanation for this opinion. Nixon's testimony was also speculative. When pressed on his opinion that there was more than one shooter based on the presence of several different types of bullets, Nixon stated: "I'm saying that it's indicative that there *could have been*, and they're not all linked to one gun. *So the possibility exists.*" (Emphasis added). Nixon also admitted that, despite the fact that there were different kinds of bullets found at the scene, they could all have been fired from the same gun.

Nixon's opinion as to the number of shooters was also based on his opinion as to the number of shots fired. This opinion, in turn, was based on alleged ricochet marks and divots in the floor visible in some of the allegedly withheld photographs of the crime scene, as well as the fact the victims together sustained five gunshot wounds. This evidence, coupled with a bullet collected from the kitchen with no biomatter on it, led Nixon to "think there were at least six and possibly more" shots

28

fired.  However, Nixon's conclusion was undermined when he admitted he had no knowledge of a shooting incident between Lambert and Moras that occurred within the house before the murders.[31]  Nor was he aware that "at times prior to the homicide . . . Billy Lambert . . . would crank rounds off in the house when he got drunk."  He conceded this could explain the "evidence of shots being fired and ricochet marks in the house."  He also conceded that, had he had this information, "it would certainly raise some doubt" as to his theory of more than one shooter.

Nixon's opinion was also influenced by the positions of the victims at the time they were shot, particularly Carol Hooper, whose body was found near the kitchen where it appeared that she was trying to escape.  Nixon explained:

> [Billy] was shot twice in the left side of the head.  Now, the three other victims were in the room, in the main part of the room, and the eldest victim, who was heading for the kitchen, heading for the kitchen door when she was shot in the back of the head.  It would seem odd that you would head for the kitchen when the front door was a more logical escape route.  So Billy had to be shot from his left side . . .  So that indicated to me that there was somebody coming up the corridor, which would have been the east side of the house. And had they shot Billy and the other people were in the room, they could have made for the front door to escape but they didn't.  So that indicated to me that there was *probably* somebody who had came [sic] through the front door too.

(Emphasis added).

Here, Nixon's opinion regarding the possibility of more than one shooter is merely a theory, largely based on speculation, and ultimately, his use of the word "probably" denotes uncertainty.  On this basis, we do not find that, had Nixon been provided with the missing ballistics documents, there is a reasonable probability that the result of the proceeding would have been different.

---

[31] During the time that Mark Moras lived with Lambert, the two had a violent encounter after Lambert discovered that Moras had stolen checks from him.  When he confronted Moras, Lambert shot at him.

Finally, even if this Court were to accept the theory of more than one shooter involved in the murders and more than five shots fired, defendant fails to demonstrate this excludes him as one of the perpetrators, given the other evidence against him. Defendant is no less culpable if he had discharged six bullets than if he had used only five to execute his nefarious acts. Nor would he be any less guilty had he enlisted accomplices to assist him rather than acting alone. We find, therefore, any failure of the State to provide defendant with all the ballistics evidence does not amount to a *Brady* violation meriting the reversal of defendant's conviction.

### *Consultation with a psychic*

Also introduced at the hearing was evidence that Det. Wilmore met with a psychic. Wilmore's handwritten notes about the psychic were not provided to defendant. Defendant contends the notes are favorable and should have been disclosed, under *Kyles*, 514 U S at 445, as they "would have raised opportunities to attack the thoroughness and even the good faith of the investigation," and could have been used to "attack[] the investigation as shoddy," and "thereby lessen the credibility of the State's case."

The trial court disagreed, finding that Wilmore was the "lone seeker of this false lead" and there exists no duty to disclose "false leads." We find no abuse of the trial court's discretion in this determination. The meeting offered no prospects or development of the case and led to no further investigation. As the *Bagley* Court made clear, a "prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley,* 473 U.S. at 675. The withholding of the information relating to Wilmore's consultation with a psychic did not deprive defendant of a fair trial, and no *Brady* violation occurred.

*Eyewitness testimony*

Another alleged *Brady* violation concerns the State's failure to disclose "critical eyewitness information" relating to two people who may have observed the area around Lambert's house on the day of the murder. First, defendant relies on a notation on the transcript of a June 4, 1996 interview with Andrew Dunn that was not turned over to him before trial. The handwritten notation appears to state: "Kirby Brown - Saw someone drop [Robinson] off that mo[rn]ing." The author of that notation is unknown; however, the content of the notation – that Brown saw defendant "dropped off that morning" – is simply not exculpatory. To the contrary, the notation tends to be incriminating. The murders occurred after Hooper, Kelly and baby Nicholas arrived at Lambert's house. There is no dispute these victims left to go to Lambert's house around 11:40 a.m. The notation, placing defendant at Lambert's house on the *morning* of the murders, is therefore incriminating, not exculpatory.

Second, even if the notation led defendant to interview and call Brown as a potential witness, his account would not have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. at 435. The only evidence of Brown's own account of what occurred that morning is contained in a signed statement he provided to defense counsel in 2018—more than 20 years after the crime.[32] Brown recalled returning to work after lunch on the day of the murders. He saw a man dropped off on Highway 1 on the side opposite of Lambert's house, cross the railroad tracks, and walk in the direction of Lambert's house. He later saw a picture of defendant and recognized him as the man he saw being dropped off. Brown explained in the statement, "Unless I finished my jobs early, I wouldn't have

---

[32] Brown did not testify at the evidentiary hearing.

finished work and come back home any earlier than lunchtime, *so I must have seen the man get dropped off at noon or later*." (Emphasis added).

This statement clearly conflicts with the notation which reported his seeing defendant on the *morning* of the murders, not after noon. It is evident from this statement Brown was merely guessing at the time he saw the person being dropped off that day. More importantly, Brown's statement is not exculpatory. Given the murders occurred between 11:40 and 12:10, it is entirely possible for defendant to have been dropped off "at noon or later" and still have committed the murders. This is clear from Det. Wilmore's testimony at the hearing. When questioned as to the length of time it takes to fire a revolver five times, Det. Wilmore responded: "[w]ithin seconds. I mean . . . just as fast as an individual could pull a trigger." Accordingly, there is no basis to the claim that, had the handwritten notation about Brown been provided to defendant, there is a reasonable probability the result of the proceeding would have been different.

The other eyewitness account cited by defendant is evidenced by a handwritten notation on the transcript of a June 5, 1996 police interview of Gary Normand which states: "Says he may have seen another auto – leaving going south (rt. before lunch) – could have been 10:00 –  check with Wayne Normand." This notation, merely stating Normand "may have seen" a vehicle going south which "could have been around 10:00" contains nothing conceivably exculpatory. It simply refers to the possibility of *a* vehicle "going south" on the morning of the murders. It has no probative value concerning murders which could not have occurred before the victims arrived at Lambert's house after 11:40.[33]

---

[33] We also note Wayne Normand gave a statement in 2010. In it, he stated Highway 1 "is a really busy road," being the "main artery between Marksville and Alexandria." He then stated, on the day of the murders, he noticed a "dark-colored car going very fast" on Highway 1 "just before lunch." It was "not the brown or tan pick-up." This information is not probative and would not have been probative had the State timely disclosed Gary Normand's notation, alerting defendant that Wayne Normand was a possible witness. The State's failure to produce Gary Normand's statement with the reference to Wayne Normand did not violate *Brady*.

Again, for a *Brady* violation, there must be a showing the withheld evidence is material, and that there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. None of the eyewitness evidence defendant relies on undermines confidence in the outcome of the trial.

### *Cumulative effect of alleged Brady violations*

When evaluating *Brady* claims, a court is to consider the cumulative effect of evidence withheld by the State to determine whether a defendant was prejudiced, and relief should be granted. *See Kyles*, 514 U.S. at 441. Here, defendant maintains the cumulative effect of the State's failure to disclose the foregoing information warrants a reversal of his conviction and a new trial. He argues: "under the proper cumulative *Brady* review, the undisclosed evidence viewed collectively – the Goodspeed Deal, the fraudulent pardons, the Serology Notes, the Delcomyn Letter, the Ballistics Evidence, the undisclosed witness statements, and the other favorable evidence – raises significant doubt about [defendant's] guilt and more than undermines confidence in the verdict in this case."

We disagree. Even assuming all the evidence relied on by defendant was favorable and withheld by the State, we find defendant has not shown the cumulative effect of its nondisclosure "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The trial court did not abuse its discretion in denying defendant's *Brady* claims, even considering the cumulative effect of all the withheld evidence.

### <u>*Alleged violations of Napue and Giglio*</u>

In this assignment of error, defendant maintains the State violated *Napue* and *Giglio* by allowing the introduction of false testimony and failing to correct testimony it knew to be false. Under *Napue*, the knowing use of false or perjured testimony against a defendant in order to obtain a conviction is a violation of due

33

process, regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected. *See Napue*, 360 U.S. at 269. When a prosecutor allows a state witness to give false testimony without correction, a conviction gained as a result of that perjured testimony must be reversed, even when the testimony goes only to the credibility of a witness. *See State v. Reed*, 14-1980, p. 41 (La. 9/7/16), 200 So. 3d 291, 321. Together, "*Giglio* and *Napue* set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair." *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008).

To prove a *Napue* claim, a defendant must show the prosecutor colluded with a witness to facilitate false testimony. *Broadway*, 96-2659, p. 17, 753 So. 2d at 814. The grant of a new trial based upon a *Napue/Giglio* violation is proper only if: "(1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material." *State v. Riley,* 23-0040, p. 22 (La. App. 4 Cir. 8/31/23), 372 So. 3d 77, 91.[34]

Although defendant's *Napue/Giglio* argument was raised, briefed and argued in the trial court, the reasons for judgment do not specifically address this issue. We therefore view this issue as having been considered and rejected by the trial court. *See*, *e.g.*, *Boone Servs., LLC v. Clark Homes, Inc*., 23-0299, pp. 20-21 (La. App. 1 Cir. 10/18/23), 377 So. 3d 304, 320 ("silence in a judgment of the trial court as to any issue, claim, or demand placed before the court is deemed a rejection of the claim and the relief sought is presumed to be denied.").

Defendant first argues that the State allowed Goodspeed to falsely testify he had not received any benefit for his testimony against defendant nor was he promised any future benefit in exchange for his testimony. In support of this claim, defendant

---

[34] *See also*, *State v. Prince*, 16-260, p. 29 (La. App. 3 Cir. 2/1/17), 211 So. 3d 481, 500; *State v. Ventris*, 10-889, p. 27 (La. App. 5 Cir. 11/15/11), 79 So. 3d 1108, 1126.

34

relies on the same evidence described above in relation to the *Brady* claim where he alleged the State withheld the fact Goodspeed was incentivized to testify against him. As we explained above, defendant has not shown any of the alleged benefits Goodspeed received before the trial were related to his testimony against defendant. Similarly, defendant failed to show the existence of any deal between the State and Goodspeed before he testified. Accordingly, defendant has not proved any trial testimony relating to Goodspeed's reasons for testifying was false—the essential component of a *Napue* claim. For these reasons, we conclude the trial court did not abuse its discretion in denying these claims.

Defendant next maintains the State violated *Napue* and *Giglio* by allowing or failing to correct false or misleading testimony from Peart regarding the red jacket found on the door handle. Peart testified he recognized the jacket as belonging to Lambert, and he and Lambert would occasionally cut themselves when putting up barbed wire fencing. Defendant argues the State "used this testimony to minimize the importance of the red jacket, implying that the third-party blood found on the jacket was unconnected to the homicides," all the while knowing "that NLCL had determined high-velocity blood spatter was found on the front and back of the jacket, suggesting it was worn in proximity to the homicides."

We find no merit to this argument. There is no evidence in the record Peart's statements regarding the jacket were false, nor that the State had knowledge of any falsity in his testimony. Furthermore, as we have found, there is nothing connecting the jacket to the murders and the presence of high or medium velocity blood spatter is immaterial.

Last, defendant argues the State failed to correct false or misleading testimony with respect to the gunshot residue ("GSR") evidence,[35] pointing to the testimony of

---

[35] GSR evidence is tested using a scanning electronic microscope ("SEM") which provides a printout of the elements that make up the particles detected in the samples.

A.J. Schwoeble of the R.J. Lee Group. As discussed in detail *infra*, Schwoeble testified that two unique GSR particles were discovered in the waistband of defendant's blue jeans, using an SEM.[36] In an appendix to Schwoeble's report, the automated printout from the SEM listed no unique GSR particles. However, handwritten on the report were notations indicating "unique" particles were present. The trial court did not expressly address this issue under *Napue/Giglio*, but found the GSR evidence "was thoroughly explored by trial counsel" and noted defendant's expert, Patricia Eddings "did a thorough review of the GSR studies, strengths and weaknesses of the use of GSR . . . Eddings cast doubt on the reliability of the test and went into extensive discussion on how cross contamination occurred so easily."

At trial, Schwoeble explained that he detected the unique particles by manual inspection. In generally describing when manual inspections are conducted, Schwoeble indicated an SEM "takes a picture and stores . . . the coordinates (of the elements) where it's [sic] located so that at the end of the analysis any particle that . . . it has flagged with any combination of lead antimony and barium we can go back and look at each composition live. When we see the particles with all three, lead, antimony, barium, we confirm that as unique to gun shot residue." Defendant contends this testimony was misleading, arguing Schwoeble testified that "the manual inspection was used to confirm the SEM reading, as though it was an extra precaution, and not to override the scientific automated results." Defendant further contends this was "highly misleading and prejudicial testimony . . . about the reliability of and possible conclusions that could be inferred from his testing."

Defendant provides no evidence Schwoeble's handwritten notation as to the particles was false. He merely argues Schwoeble did not "confirm" the SEM's results, but rather overrode them. We find no indication Schwoeble's testimony in

---

[36] As the experts for both the State and defendant explained, particles that are "unique" to GSR have a combination of three chemicals: antimony, barium and lead. Other particles that have some, but not all, of these chemicals are "characteristic" of GRS.

describing the general procedure for using SEMs and manual inspections was false, as required by *Napue* and *Giglio*. Nor did Schwoeble expressly state that, with respect to the GSR sample examined in this case, he manually "confirmed" any finding by the SEM. As there is an absence of evidence that Schwoeble's testimony was false, we find defendant's *Napue* claim lacks merit and the trial court did not abuse its discretion in denying it.

### *Actual innocence*

Defendant also assigns as error the trial court's failure to find him actually innocent of the four murders. Like defendant's *Napue/Giglio* claim, the trial court's reasons for judgment do not specifically address factual innocence, although the issue was raised and briefed.[37] We also view this issue as having been considered and rejected by the trial court. After thoroughly considering defendant's actual innocence claim in light of relevant case law, we find it lacks merit.

In order to establish actual innocence, a defendant must show "'in light of all the evidence,' that 'it is more likely than not that no reasonable juror would have convicted him.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998), quoting *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995). The *Bousley* Court made clear that "'[a]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.*, 523 U.S. at 615.

Defendant's post-conviction proceeding took place before the recent enactment of La. C.Cr.P. art. 962.2.[38] Therefore, we review defendant's claims

---

[37] The trial court's reasons for judgment reflect the court did, however, consider the evidence of "Other Possible Suspects and/or Witnesses," including, more particularly, "other possible suspects especially as any evidence connected a possible other vehicle driving near/at the scene, the red jacket and the DNA findings from the red jacket." These are all elements of defendant's actual innocence claim. As the trial court likewise observed, "information about Moras was heavily explored and a review of the trial transcripts notes that Mr. Moras' conflict with the deceased Billy Lambert was raised on multiple occasions."

[38] Actual innocence claims are now governed by La. C.Cr.P. art. 962.2, which became effective on August 21, 2021. Article 962.2 adopted a statutory basis for a factual innocence claim. *See, e.g., Jones v. State*, 22-01455, p. 345 n.2 (La. 5/5/23), 362 So. 3d 341, 345 (in enacting La. C.Cr.P. art. 926.2, "the legislature codif[ied] the heightened evidentiary standard articulated in *Burrell*,

under *Conway*, 01-2808, (La. 4/12/02), 816 So. 2d 290, 291, where this Court held: "assuming that a claim of 'actual innocence' not based on DNA evidence under La.C.Cr.P. art. 926.1 is cognizable on collateral review under La.C.Cr.P. art. 930.3," it must be a "*bona fide* claim of actual innocence," involving "'new, material, noncumulative,' and 'conclusive' evidence, . . . which meets an 'extraordinarily high' standard, . . . and which 'undermine[s] the prosecution's entire case'[.]" *Conway*, 01-2808, 816 So. 2d at 291 (internal citations omitted); *see also*, *State v. Pierre*, 13-0873, p. 8 (La. 10/15/13), 125 So. 3d 403, 408 (for "free-standing, post-conviction claims of actual innocence not based on DNA evidence," "this Court declined to hold that such claims are, in fact, cognizable in collateral attacks on final convictions . . . .") (citing *Conway*).

Defendant maintains he met this burden by introducing new, non-cumulative evidence demonstrating his actual innocence, and furthermore, "conclusively pointing to" Moras "as the actual perpetrator."

The primary evidence upon which defendant relies for his actual innocence claim is the DNA evidence of Moras's blood on the red jacket. He states: "most importantly through DNA testing Moras's blood was found to be on the red jacket found at the scene of the murders," and identifies the red jacket as "the smoking gun that confirms [Moras's] guilt." Again, the record does not provide any basis to connect the jacket to the murders. Although Moras's blood stains were detected on the jacket, there is no evidence Moras's blood was found anywhere else in the house. Defendant fails to provide a plausible explanation as to how Moras would have been injured and bled during the course of an attack on the victims. There is likewise no evidence of any event that would have left Moras's blood on the red jacket, alone, and nowhere else at the scene. That some blood stains on the jacket were ultimately

_____

*Pierre*, and *Conway* in . . . defining factual innocence in the context of criminal post-conviction relief.").

38

attributed to Moras does not in any way exonerate defendant nor implicate Moras in the murders. Evidence of blood on the jacket only supports the conclusion that Moras, who had recently lived and worked on the property, somehow bled on the jacket at some unknown time. Accordingly, while the DNA evidence of Moras's blood may be "new," we find it is certainly not "conclusive evidence that undermines the prosecution's case."

The remainder of the evidence defendant relies on in support in his actual innocence claim comes from witnesses who allegedly placed Moras at Lambert's house on the day of the murders or otherwise implicated him in the murders. Having reviewed this evidence, we find it does not meet the extraordinarily high standard set forth in *Conway*.

One of the witnesses upon whom defendant relies is Linda Lachney, a former girlfriend of Moras's brother, who testified at the evidentiary hearing. In 2015, Lachney signed an affidavit attesting to the following facts. She saw Moras "at the back of [Lambert's] house by the cattle gate" on the morning of the murders when she and her father went to have coffee with Lambert. When she approached Lambert's house, she saw the bodies of the victims inside, and "got scared and left in a hurry." She also saw defendant on the morning of the murders "near the train tracks" and looking "wide eyed" and "scared." When Moras was drunk years later, he bragged about having committed the murders with his brother and a third unknown person (not defendant). He and his brother also talked about having "set a trap" so defendant would be blamed for the murders.

At the hearing, Lachney recanted some of the information from her affidavit. She testified she and her father went to Lambert's house before noon on the day of the murders and she saw defendant running from the property toward the railroad track, looking scared. She then looked in the windows of the house, saw the victims,

39

and went home to call 911.[39]  When questioned about her affidavit, Lachney testified she signed it without reading it, having been harassed and pressured to do so by members of the defense team, and she now believes the affidavit to be false.

More importantly, Lachney testified at the hearing she did *not* see Moras at Lambert's house on the day, but rather, saw him the day before.  She also testified Moras never admitted to having killed the victims.

Lachney's having reportedly seen defendant fleeing from Lambert's house on foot before noon, as she originally stated in her affidavit, provides no support to defendant's actual innocence claim.  There can be no doubt defendant fled in Lambert's car some time after 12:10 (likely several minutes later than 12:10) and 12:15.  We do not find Lachney's conflicting accounts of her observations on the day of the murders provide conclusive evidence that undermines the State's case.

The other witness upon whom defendant relies to place Moras at the Lambert house on the day of the murders is Lou Ella Rollins, Moras's girlfriend at the time of the murders.  Rollins did not testify at the hearing, nor did she provide an affidavit.  Her statements about Moras were introduced through the affidavit and testimony of defense investigator, Gary Eldredge.  In his affidavit, Eldredge stated Rollins told him she had been with Moras on the morning of the murders but left to go to Lambert's house to "get [him] some money."  In the afternoon, Moras returned to her house and said he had gotten money from Lambert.  Rollins reportedly also said that, later, she  thought Moras "told [her] about what had happened at [Lambert's]" but she couldn't remember what he said and "guess[ed] [she'd] blocked it all out."

Rollins's statements to Eldredge are clearly hearsay.  *See* La. C.E. art. 801 C (" 'Hearsay' is a statement, other than one made by the declarant while testifying at

_____

[39] No evidence was introduced to substantiate Lachney's 911 call on the morning of the murders. The only 911 call reflected in the record is the one made by the Town & Country employee after Foster reported having discovered the murder victims.

40

the present trial or hearing, offered in evidence to prove the truth of the matter asserted."). However, as the Court observed in *Tassin,* "[s]ince the search for truth is the district court's paramount concern, all reliable evidence tending to establish the relevant facts should be considered. With the judge as fact-finder in this hearing, objections on traditional hearsay grounds generally can be considered as affecting the weight rather than the admissibility of the evidence.") (quoting Cheney C. Joseph, "*Postconviction Procedure,*" 41 La.L.Rev. 625, 636-638 (1981)). *Tassin,* 602 So. 2d at 724. Nevertheless, Rollin's statement to Eldredge does not provide evidence of defendant's actual innocence. Moras's purportedly having told Rollins that he had gone to Lambert's house on the day of the murders does not exonerate defendant of the murders (nor incriminate Moras).

The other "new" evidence defendant cites in support of his actual innocence claim is of Moras's threat to kill Lambert after he was arrested for forging checks, and evidence that Moras's alibi is "demonstrably false." Defendant first points to the testimony of Greg Wampler, a Rapides Parish assistant district attorney, as evidence of Moras's threat to kill Lambert. Wampler's testimony, however, only demonstrates that he heard unsubstantiated rumors that Moras had threatened to kill Lambert.[40]

We likewise find no merit to defendant's claim that Moras's alibi is "demonstrably false." The evidence defendant points to for this claim includes the testimony of the two eyewitnesses who placed Moras at Lambert's house on the day of the murders (Lachney and Rollins) and the red jacket, all of which we have

---

[40] Wampler testified as follows:

> Q: . . . Alright. Do you recall commenting at that meeting that you had heard Mark Moras had threatened Billy Lambert's life?

> A: I do not recall that, but I do recall there were rumors that I heard that were all over the board during this process. Just multiple rumors and if I made that comment - I do recall hearing that rumor. We never were able to verify that any of that was true.

considered and rejected. He also relies on the testimony of Wayne Guillot, a volunteer fireman. In a pre-trial interview with Delcomyn, Moras indicated he learned of the murders from speaking with Guillot on the day of the murders. Guillot, however, testified at the hearing that he did not speak with Moras, did not tell him about the murders, and would not have shared the confidential information he learned about the murders in his capacity as a volunteer firefighter. While Guillot's testimony contradicts Moras's statement to Delcomyn, it does not have any bearing on Moras's alibi, as we note *infra* in our ineffective assistance of counsel discussion.

Based on the foregoing, we find that defendant has not met the extraordinarily high standard of actual innocence through new and conclusive evidence undermining the State's entire case.

### *Ineffective assistance of counsel during the guilt phase of trial*

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984). the United States Supreme Court explained:

> [a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

The Court clarified that, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.*, 466 U.S. at 687-88. "The *Strickland* test of ineffective assistance affords a 'highly deferential' standard of review to the actions of counsel to eliminate, as far as possible, 'the

42

distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from counsel's perspective at the time.'" *State v. Harris*, 18-1012, p. 16 (La. 7/9/20), 340 So. 3d 845, 856 (quoting *Strickland*, 466 U.S. at 689). If a defendant establishes his counsel's performance was deficient, he must then demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

### *Moras as the alleged perpetrator of the murders*

Defendant first argues trial counsel was ineffective because he failed to develop evidence that Moras committed the murders. Much of the evidence upon which defendant relies as to the identification of Moras as the perpetrator was considered in defendant's actual innocence claim; however, we consider that evidence anew in his ineffective assistance of counsel claim.

Defendant asserts counsel did not interview a variety of witnesses including those who placed Moras at the scene on the morning of the murders, those who undermine Moras's alibi, and those who said Moras bragged about committing the murders. In its written ruling, the trial court noted Moras was raised as alternative suspect at trial where the jury heard about his ongoing conflict with Lambert at the time of the murders.

As previously discussed, at the hearing, defendant called Lachney to testify about Moras's involvement in the crime. Again, Lachney signed an affidavit in 2015 stating she had seen Moras in the back of Lambert's house near a cattle gate on the morning of the murders and she later heard Moras brag about committing the murders. However, she testified she did not see Moras at the Lambert house the morning of the murders and she retracted her claim that she heard Moras brag about the murders, stating that "he never told me he killed Lambert." Lachney's remaining

43

testimony was of extremely limited value to defendant. Accordingly, we find trial counsel was not deficient in his performance in not calling Lachney as a witness; even if he were, the failure did not prejudice defendant.

As previously noted, Louella Rollins, Moras's girlfriend at the time of the murders, recalled to defense investigator Eldredge that Moras told her on the morning of the murders he was going to Lambert's to collect on money he was owed. Later that day, Moras told her he had gotten the money from Lambert. This account would have corroborated the account contained in Lachney's affidavit.

However, importantly, as we also previously noted, Rollins did not testify at the post-conviction hearing[41] nor did she provide a signed affidavit to this effect.[42] The evidence of Rollins's account was admitted through the testimony of Eldredge. Assuming the truth of Eldredge's testimony as to what Rollins reportedly told him, it provides no basis to develop Moras as the perpetrator of the murders. Accordingly, the trial court did not abuse its discretion in according Eldredge's account of events little, if any, weight. Likewise, we find the failure to develop Moras as a suspect through Rollins does not render defense counsel's performance deficient.

Defendant further asserts trial counsel was ineffective for failing to interview Warren Guillot to counter Moras's statement that Guillot was the person who informed him of the murders on the same day of the murders. Even if Guillot's memory was correct and Moras's account of learning about the murders from Guillot was not accurate, it does not render Moras's alibi—that he spent most of the day doing tasks with his girlfriend's father—impossible. As Guillot's testimony would not have added anything substantive to defendant's defense, we do not find trial counsel's failure to interview Guillot rendered his performance deficient.

___

[41] Rollins appeared at court to testify but was so anxious, defense counsel opted not to call her as a witness and asked the court to release her from her subpoena.

[42] A declaration signed by Rollins five years before the investigator interviewed her did not include the account of Moras's whereabouts on the day of the murders.

Considering the weakness of the evidence submitted in post-conviction to support defendant's claim of ineffective assistance of counsel in relation to the failure to further develop Moras as an alternative suspect, any possible deficiencies in his performance in this regard did not prejudice defendant.

### GSR evidence

Defendant next argues trial counsel was ineffective in his handling of the GSR evidence. Among its reasons for denying the post-conviction application, the trial court noted the GSR evidence was "thoroughly explored by trial counsel." The jury was told there were two "unique" GSR particles found on defendant's clothing. The jury also learned how easily GSR particles can be transferred between surfaces and about the possibility of contamination of defendant's clothing. The jury further heard about the "open use of guns in the home of Billy Lambert" as well as "the number of law enforcement individuals who searched or touched Robinson while he was being arrested and transported."

Defendant complains trial counsel did not challenge the qualifications of the State's GSR expert, Schwoeble, did not ask his own expert about the reliability or significance of the State's GSR evidence, and did not point out the discrepancy between the SEM summary sheet and the handwritten notes on the worksheets. When trial counsel testified at the hearing, he did not address what, if any, reason or explanation he had for not raising these issues during trial. Defendant's expert in capital defense, James Boren, testified there was no reasonable explanation for trial counsel's failures in handling the GSR evidence.

Nevertheless, we do not find counsel performed deficiently by not raising these issues at trial. First, defendant has not shown the purported lack of qualifications of the State's expert rendered the results of his testing unreliable.[43]

---

[43] Although defendant cites one unreported case, *State of Minnesota v. Moua*, in which Schwoeble was precluded from testifying, numerous courts have allowed him to testify. *See*, *e.g.*, *State v. Logan*, 07-739, p. 9 (La. App. 5 Cir. 5/27/08), 986 So. 2d 772; *State v. Brashears*, 04-1207 (La.

45

Additionally, as noted by the trial court, only two particles unique to GSR were reported found on defendant's clothing. Counsel may have determined it was not in defendant's interest to undermine the reliability of these results by calling into question the qualifications of the State's expert, given he had detected so few particles. Defendant has not established this was not a reasonable strategic decision.

Second, Patricia Eddings, defendant's GSR expert at trial, successfully challenged the reliability of the State's GSR evidence by explaining how it is easily transferable and by introducing the possibility the particles on defendant's clothing may have originated, not from him shooting the victims, but from his interactions with police or from contamination due to the manner in which his clothing was stored by police. Eddings also explained the meaning of the classification of particles as "characteristic" or "unique." She touched on the fact of new research suggesting that particle combinations once believed to be unique to GSR were *not*, in fact, unique, and have been found in automobile braking systems and fireworks. She noted that, at the time of trial in 2001, this research had not yet been published and was not yet generally accepted.

During the evidentiary hearing, defendant's new GSR expert, Nixon, testified, in part, that the research Eddings testified to had since become generally accepted. As he explained, "research has demonstrated that you can get those tri-element particles from other sources," and as such, they were no longer classified as "unique" and are now described as "characteristic." He stated that this change had occurred in "in the last few years." In short, as a result of trial counsel's performance, the jury learned about the state of GSR science as it existed at that time, including the latest research. Trial counsel's performance in this area was not deficient.

App. 5 Cir. 4/26/05), 902 So. 2d 536; *Commonwealth v. Reid*, 259 A.3d 395 (Pa. 2021); *Tyson v. People*, 59 V.I. 539 (2013); *People v. Adams*, 926 N.Y.S.2d 345 (Sup. Ct. 2011); *Smith v. State*, 423 Md. 573; 32 A.3d 59 (2011); *United States v. Pearsall*, 492 F.Supp.2d 432 (D. Del.2007).

Third, defendant argues trial counsel failed to question either party's GSR expert about the discrepancies between the findings in the GSR summary sheet and the findings in the worksheets. The summary report of the analysis showed two particles found on defendant's waistband were tri-element (lead (Pb), antimony (Sb), and barium (Ba)), which, at the time, fit the criteria to be deemed "unique" to GSR. However, the worksheets contained in the appendix to the report showed the SEM had detected *zero* unique particles on the waistband.

The images and spectra worksheets contained in the appendix to the report showed the SEM had found one particle reported as "lead rich" and handwritten next to that was the notation: "+ Sb + Ba ✓unique." For the second particle, the SEM detected lead and antimony, and handwritten next to that result was the notation: "+ Ba unique." In short, it appears the expert manually detected additional elements making the particles "unique" (as accepted when the testing occurred in 1998) when the SEM had not detected them as such.

In post-conviction, Nixon obtained the 2014 protocols of the R.J. Lee Group for testing GSR (he was told the protocols for 1998 were not available). He testified at the hearing that Schwoeble's practice of writing in additional elements not identified by the SEM to become a "unique" particle violated the lab's 2014 protocols.[44] However, defendant did not demonstrate the practice violated the

---

[44] The 2014 protocol permitted manual changes to the SEM analysis under certain circumstances. The protocol provided as follows:

13.14 After the analysis of a particle, its identification can change. When this occurs, the original identification should be crossed out and the proper error code (see Attachment 1) and/or identification should be noted. 13.14.1 Reasons for an identification change are:

13.14.1.1 When a one component particle becomes a two component particle or a particle characteristic of GSR,

13.14.1.2 When a two component particle becomes a one component particle or a particle characteristic of GSR, and

13.14.1.3 When a particle characteristic of GSR becomes a one or two component particle.

13.14.2 The additional presence of a trace amount of Pb, Sb, or Ba can change a one component particle into a two component particle, but cannot change a two

47

protocols in place at the time the testing was conducted. Nor did he demonstrate the practice resulted in inaccurate results. Therefore, defendant has failed to show trial counsel was deficient for not challenging Schwoeble on this issue.

### *Flight*

At trial, the State relied on defendant's flight from the scene of the murders as evidence of his consciousness of guilt. In post-conviction, defendant argues his trial counsel was ineffective because he did not investigate and explain his innocent reasons for fleeing. Defendant contends "several factors influenced" his flight, including abuse suffered as a child, brain damage, post-traumatic stress disorder ("PTSD"), mental health issues, a history of fleeing from stressful situations and Cajun "cultural influences" (he argues his Cajun culture, "by its very nature, reinforced mistrust of authorities," including the police.).

In the trial court's written reasons for judgment, the judge opined: "[c]hoosing how best to convince the jury that flight was out of fear and not that of guilt would be an issue of strategy for the trial counsel." The trial court acknowledged that in post-conviction, information had been discovered about defendant's childhood; however, as the court noted, "that information could have also been used *against* him in trial." (Emphasis added). The court concluded, "[t]rial counsel may have been strategic in not bringing this information forward."

Defendant's flight from the scene, at first glance, was not *necessarily* evidence of his consciousness of guilt. Indeed, he was not the only person to flee from the scene. Foster and Lachney also testified they left the scene as soon as they discovered the victims. What distinguishes defendant's actions is, unlike the other

component particle into a particle characteristic of GSR due to the high significance of characteristic particles.

13.14.3 When a particle characteristic of GSR has one (1) of the elements in a trace amount, it becomes a two component particle.

13.14.4 When a two component particle has one of the elements in a trace amount it stays a two component particle.

two witnesses, he did not leave to seek aid for the victims or contact law enforcement. Moreover, his *manner* of flight raises additional suspicions in that he sped away in the victim's truck and proceeded to drive recklessly for miles, even side-swiping another vehicle. He was apprehended after plowing through a fence, abandoning his truck, and hiding behind a mound of dirt. When apprehended, he stated: "I'm not armed. I don't have a gun," and further admitted: "I'm on medication for violent tendencies."

As this Court has long recognized, "[e]vidence of flight, concealment, and attempt to avoid apprehension . . . indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt." *State v. Davies*, 350 So. 2d 586, 588 (La. 1977). The *Davies* Court also observed that "actions of the accused during the period of his flight is generally relevant," as well. *Id*. (quoting 22A C.J.S., Criminal Law, § 625A, pp. 460 et seq.). Cases following *Davies* have consistently held flight from the scene of a crime evidences consciousness of guilt, as do actions during the course of flight. *See*, *e.g.*, *State v. Johnson*, 440 So. 2d 838, 842 (La. App. 2 Cir. 1983) ("Defendant's flight from the scene and his actions attendant thereto were certainly relevant to show his consciousness of guilt.").

Here, defendant not only fled from Lambert's house in Lambert's truck, he drove erratically for miles – traveling fast, going off the road at times, hitting another vehicle without purposefully stopping, and forcing other vehicles off the roadway. Under these circumstances, we find his behavior to be indicative of a consciousness of guilt. As the *Robinson I* Court found, "the jury was within the bounds of rationality to reject as unconvincing defendant's hypothesis of innocence that, like Doris Foster, he also happened innocently upon the crime scene." *Robinson I*, 02-1869, pp. 14-15, 874 So. 2d at 78.

Defendant's novel argument concerning his Cajun heritage causing him to distrust authority and have an "inherent tendency to flee when faced with conflict or

stress" is not substantiated by any recognized authority. There is no record evidence establishing that this theory is generally known or accepted. This argument lacks merit.

We are likewise unpersuaded by defendant's argument his counsel was ineffective for failing to present evidence of PTSD, frontal lobe impairments, childhood abuse, head injuries and substance abuse as additional justification for his flight from the scene. Defendant points to medical records of family members demonstrating "the family mental health history" obtained by post-conviction counsel. He argues his "genetic predisposition to mental health issues based on his family history of mental health issues was critically important at trial and should have been presented to the jury."

First, evidence was adduced at trial of defendant's substance abuse issues and that defendant was abused as a child, neither of which would have explained why defendant fled from the scene of the crime. Second, as concerns defendant's alleged brain impairments, although defendant was involved in several incidents (car accident, motorcycle accident, and a neck injury resulting from a malfunctioning parachute when he was in the military), no one testified as to any objective evidence of a head or brain injury. Dr. Pinkston testified none of defendant's medical records reflected evidence of concussions, traumatic brain injury or "brain insults."[45] Notably, Dr. Shaffer confirmed that medical records from every assessment of defendant at Angola Penitentiary reflected no mental health problems, as evidenced from the following colloquy about those records:

> Q. . . . what struck me in reviewing these records, Doctor, and you tell me if I'm wrong, is that every time they assessed this defendant for mental health problems, there were no issues found.
>
> A.    Yes.

---

[45] Defendant's expert, a neuropsychologist, Dr. Robert Shaffer, agreed that no records showed that defendant ever had a concussion.

Q. And we're talking assessments *done all the time from the time he was admitted to Angola*. Is that correct?

A. Yes.

(Emphasis added).

This Court has addressed ineffective assistance of counsel claims in the context of an attorney's failure to investigate claims of mental health issues. In *State v. Hamilton*, 92-2639, p. 7 (La. 7/1/97), 699 So. 2d 29, where the defendant had a history of mental health issues (including auditory and visual hallucinations), this Court found trial counsel's failure to conduct a reasonable investigation constituted reversible error, as it could have been a mitigating factor for the jury to consider in the sentencing phase. Similarly, in *State v. Bell*, 16-0511, p. 12 (La. 4/24/17), 217 So. 3d 330, 337, in support of his ineffective assistance of counsel claim, the defendant argued "that counsel failed to investigate with sufficient zeal to discover his alleged brain abnormalities, which could have served as mitigation evidence." In rejecting this claim, this Court found:

> . . . relator fails to demonstrate that *at the time of the offense* he suffered from any brain abnormalities or mental illness which would have caused impaired capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." *See* La.C.Cr.P. art. 905.5.[46]

*Id.* (Emphasis added).

In this matter, all of the neuropsychological testing was performed on defendant in post-conviction, many years after the murders occurred.[47] Given the significant length of time between the murders and the time of the testing, even if we were to accept defendant suffers from various mental issues now, there is no way

---

[46] Louisiana Code of Criminal Procedure article 905.5 sets forth "mitigating circumstances" to be considered in sentencing for capital cases.

[47] Dr. Shaffer met with defendant in 2015; Dr. Ricardo Weinstein met with defendant in 2009; and Dr. Charles Sanislow met with defendant on several occasions between 2015 and 2018.

51

to determine whether those conditions existed prior to or at the time of the murders. Without any evidence defendant suffered from PTSD or mental health issues at that time, we cannot say his counsel's performance was deficient for failing to investigate this issue to explain defendant's flight from the scene of the murders. Nor do we find that trial counsel's actions in not discovering and presenting the evidence to the jury that members of defendant's family suffered from mental illness creates a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Based on the foregoing, defendant has not shown this additional evidence would have convinced the jury of his reasons for fleeing from the murders. Defendant has likewise not provided an explanation for his behavior in fleeing the scene sufficient to undermine confidence in the outcome of the trial. Accordingly, having examined each instance of defendant's claims of ineffective assistance during the guilt phase claim, our confidence in the just outcome of his trial is unchanged. We find no abuse of the trial court's discretion in its denial of defendant's claim of ineffective assistance of counsel.

### *Ineffective assistance of counsel during the penalty phase of trial*

In making this claim, defendant is essentially arguing that, because of his trial counsel's deficient performance, his sentence should be vacated and the matter remanded for re-sentencing. This implies his belief he should receive the minimum sentence for this crime. We do not agree.

"Sentencing is a critical stage of the proceeding, at which there is a right to the effective assistance of counsel . . . ." *Harris*, 18-1012, p. 16, 340 So. 3d at 856. As this Court explained:

> [w]hen a defendant challenges the effectiveness of his counsel at the penalty phase, the court must determine whether there is a reasonable probability that, absent counsel's errors, the sentencer would have concluded the balance of aggravating and mitigating factors did not warrant death. Unless defendant shows both a deficient performance

52

and prejudice, the court cannot find his death sentence resulted from a breakdown of the adversarial process which rendered the result unreliable.

*State v. Sparks*, 88-0017, p. 61 (La. 5/11/11), 68 So. 3d 435, 482 (internal citations omitted).

In post-conviction, defendant argues his trial counsel "provided ineffective assistance of counsel by failing to adequately investigate and present mitigating evidence at the penalty phase of his capital trial. Not only did trial counsel fail to present an integrated theory to the jury . . . they failed to follow up on numerous red flags that demanded additional investigation." Defendant cites a number of ways his trial counsel was allegedly ineffective at this stage of the proceeding and contends this Court should vacate his death sentence, or alternatively, grant a new sentencing hearing.

In considering defendant's ineffective assistance of counsel in the penalty phase, the trial court observed "[t]he defense presented 22 witnesses at the penalty phase. Its case included defendant's mother, sister, uncle, cousin, school friends, educators – both nuns and lay teachers, friends defendant made during military service, co-workers, deputies from the Rapides Parish Detention Center, a prison consultant, and defendant's spiritual advisor." *Robinson, I,* 02-1869, p. 33, 874 So. 2d 66. Addressing the ineffective assistance of counsel at sentencing claim, the trial court noted that counsel provided "exemplary service to his client throughout this phase of the case." The core problem that defendant encounters with this claim is that there is nothing about the circumstances of this case that indicate that the sentence imposed was inappropriate.

### *Residual doubt*

Defendant first contends trial counsel was ineffective for failing to present evidence of residual doubt during the penalty phase of the trial.[48] Residual doubt has been defined as "a lingering uncertainty about facts – a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.'" *Franklin v. Lynaugh*, 487 U.S. 164, 166 (1988). However, neither the United States Supreme Court nor this Court have recognized "residual doubt" as a mandatory mitigating factor in the sentencing phase of a case. *See Oregon v. Guzek*, 546 U.S. 517, 525 (2006) ("*Franklin v. Lynaugh* . . . makes clear . . . that this Court's previous cases had *not* interpreted the Eighth Amendment as providing a capital defendant the right to introduce at sentencing evidence designed to cast 'residual doubt' on his guilt of the basic crime of conviction. The *Franklin* plurality said it was 'quite doubtful' that any such right existed.") (emphasis supplied); *State v. Davis*, 637 So. 2d 1012, 1031 (La. 1994), (where defendant requested a jury charge to the effect that, even though the jury found the defendant guilty of a capital offense, it could still impose a life sentence if it had any lingering or residual doubt, this Court stated: "*This standard of proof has no statutory or jurisprudential basis*.") (Emphasis added). Thus, counsel cannot be deemed deficient in failing to present evidence of residual doubt during the penalty phase of a defendant's trial.

### *Other ineffective assistance of counsel claims*

We further find no merit to defendant's claim that his counsel was deficient in failing to interview and call various witnesses who would have testified as to

---

[48] In support of this claim, defendant argues that:

> compelling evidence of innocence exists that the jury never heard: among many other items, the State withheld evidence that jailhouse snitch Leroy Goodspeed received favorable treatment in exchange for his testimony; the State's gunshot residue expert altered the testing results writing in the only "unique" particles found on Appellant's clothing, and DNA and eyewitness evidence point to an alternate suspect as the true perpetrator of the murders. Further, evidence was available to explain why Darrell Robinson fled from the scene that the jury never heard.

defendant's tendency to leave situations he could not handle, that he was most comfortable outdoors, he was a "protector" of women and children, and shooting and killing four innocent people, including a toddler, "would be out of character" for him. The trial court's reasons for judgment noted trial counsel called "multiple family, jail and faith-based witnesses" who testified at the penalty trial "about Robinson's rough childhood and adult history with his parents, sister, relatives and friends." The jury also heard about defendant's struggles with alcohol and his faith. In considering defendant's claim of ineffective assistance of counsel, the trial court gave deference to "trial counsel's judgment, tactical decision and trial strategy" and concluded that his performance was not deficient. We cannot say that the trial court's findings in this regard resulted from an abuse of discretion.

The United States Supreme Court has explained:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Here, the attorney who represented defendant during the penalty phase of the trial provided no explanation as to why she did not pursue the mitigation witnesses and experts investigated by post-conviction counsel. Accordingly, we cannot say trial counsel's decision was *strategic*. She admitted she was part of defendant's defense team for over four years, her team was fully funded, and she was confident she and her investigators could have located and interviewed these witnesses. Although counsel's performance in this area may not have been guided by a

reasonable strategic decision, we cannot say it fell below an "objective standard of reasonableness."

Even assuming counsel's performance *was* deficient and as a result some potentially relevant pieces of mitigating evidence were not heard by the jury, considering the aggravating factors that were proven beyond a reasonable doubt and the mitigating evidence that *was* heard by the jury, this additional information does not sufficiently upset the balance of aggravating and mitigating factors to conclude that death is not warranted. We therefore cannot say that confidence in the sentence is undermined by counsel's failure to present this additional mitigating evidence.

### *Ineffective assistance of counsel in challenging the discriminatory selection of the grand jury foreman*

In *State v. Juniors*, this Court explained the showing necessary to make a successful claim of discrimination in the selection of a grand jury foreman:

> To demonstrate an equal protection violation based on discrimination in the selection of the grand jury foreperson, a defendant is required to establish a prima facie case of purposeful discrimination. A prima facie showing of purposeful discrimination is established by proving: (1) those alleged to be discriminated against belong to an identifiable group in the general population; (2) the selection process is subject to abuse according to subjective criteria; and (3) the degree of under-representation, as shown by comparing the proportion of the group at issue found in the general population to the proportion called to serve, over a significant period of time. If the defendant establishes a prima facie case of discrimination using this approach, the burden shifts to the State to rebut that prima facie case.

*Juniors*, 03-2425, p. 36 (La. 6/29/05), 915 So. 2d 291, 321 (internal citations omitted).

Defendant argues trial counsel was ineffective, *not* because he altogether failed to challenge the selection of the grand jury foreperson (because he made that challenge), but, for doing so in a deficient manner. In 1999, defense counsel raised this issue in a pre-trial "Motion to Dismiss the Indictment Due to Discrimination in the Selection of Grand Jury Foreperson." Defendant argued that there had been "an underrepresentation of African-Americans and women in the selection process,"

56

having "studied the grand jury forepersons over an eleven year period ending with his indictment."[49] The trial court ultimately denied the motion.

In post-conviction, defendant argues trial counsel submitted "racial composition data of grand jury forepersons for *only a decade* prior to" defendant's indictment. (Emphasis added). He maintains that "a robust analysis of a *two decade* period shows that the process by which the jury foreperson was selected" was discriminatory. (Emphasis added). He argues the data submitted by defense counsel was not "a broad enough range of data" and therefore, defense counsel's performance was deficient.

Defendant's post-conviction counsel claim is that a twenty-year period would have been appropriate. Defendant cites no authority for this position. In *Juniors*, this Court indicated the third prong of the test for this claim (the degree of under-representation) "requires a statistical showing of substantial under-representation over a substantial period of time . . . ." *Id*., p. 37, 915 So. 2d at 321. The Court did not establish any parameters setting forth what constitutes a "substantial period of time" and we decline to adopt any rules in this regard. However, even in the absence of specific parameters, we find no merit to defendant's ineffective assistance of counsel claim concerning his counsel's challenge to the selection of the grand jury foreman.

First, as noted, defendant presents no evidence the additional allocation of resources to investigate statistical data beyond eleven years was not a reasonable strategic decision by trial counsel. Second, even assuming counsel was deficient in the manner in which he challenged the selection of the grand jury foreman, defendant

---

[49] Along with this motion, defendant filed a "Motion to Dismiss the Indictment Due to Discrimination in the Selection of Grand Jury Foreperson," as is required to maintain this claim. *See State v. Blank*, 04-0204, p. 32 (La. 4/11/07); 955 So. 2d 90, 140 ("defendant's failure to file a motion to quash the indictment based on the allegedly discriminatory procedure waived any claim about the selection of the grand jury which indicted him. *See Deloch v. Whitley*, 96-1901, p. 1 (La.11/22/96), 684 So. 2d 349 ("Counsel must assert the equal protection claim in a pre-trial motion to quash or waive any complaint in that regard")).

has failed to show he was prejudiced by this failure. Presuming effective counsel would have made a stronger prima facie showing of racial or gender discrimination in the selection process, it would have merely shifted the burden to the State to rebut the showing of purposeful discrimination. Defendant provides no evidence the State would not have succeeded in this showing. He further provides no evidence of *purposeful* discrimination in the selection of the foreperson on the grand jury that issued the indictment against him. This claim is without merit.

### *Other juror issues*

In this assignment of error, defendant maintains the trial court erred in considering his juror-related claims exclusively in the context of his ineffective assistance of counsel claim. He cites two specific instances: (1) a juror's reference to the Bible when imposing the sentence and (2) a juror's having seen defendant in hand shackles, and argues "the court simply folded these two independent claims into the ineffective assistance of counsel claim analysis and applied the *Strickland* two prong test to determine if [his] trial counsel acted appropriately."[50] As the trial court did not address these issues as "separate and apart" from the ineffective assistance of counsel claims, defendant urges this Court to decide these issues *de novo*.

We have considered defendant's arguments and, based upon our well-settled jurisprudence discussed more fully *infra*, neither the juror's consulting the Bible nor

---

[50] In its Written Reasons for Judgment, the trial court stated:

> As to the possible issues with members of the jury during trial, information has now been submitted that a juror had with her a bible during deliberations and that jurors observed [defendant] in shackles. During jury selection, jurors were asked could they put aside any of their personal concerns. In addition, the Trial Court have instructions to put aside their personal views and exam[ine] only the evidence presented at trial. Information has been submitted that jurors were able to see [defendant] in hand shackles as he went to and from the court. Neither of these issues were raised on the record by trial counsel and post-conviction counsel suggest it was ineffective assistance.

Although the trial court denied all of defendant's ineffective assistance of counsel claims, it did not make any more specific findings with respect to these two jurors.

the juror's observing defendant in hand shackles provide a basis for the reversal of defendant's conviction. To the extent that either of these circumstances were known by trial counsel, but were not raised, they did not prejudice defendant.

Concerning the juror misconduct claim, defendant asserts that after E.G.B. was selected to be a juror in his trial, she consulted a Bible "for guidance on what to do" and the passage she read "personally determined" her decision to vote for death. Defendant argues that E.G.B.'s consultation with the Bible in her hotel room violated his Sixth Amendment rights because she was exposed to an improper external influence. *See Oliver v. Quarterman*, 541 F.3d 329, 340 (5th Cir. 2008) (holding a jury's consultation of Bible passages was an external influence barred by the Sixth Amendment). At the hearing, E.G.B. agreed the Bible helped guide her in making decisions in the case. However, she also confirmed she did not bring the Bible into the jury room during deliberations and denied that reading the Bible passage caused her to vote for death.

This case is distinguishable from *Oliver*. In *Oliver*, the United States Court of Appeals for the Fifth Circuit explained that "when a juror brings a Bible into the deliberations and points out to her fellow jurors specific passages that describe the very facts at issue in the case, the juror has crossed an important line." *Id.* at 339. Such action amounts to an "external influence on the jury's deliberations." *Id.* at 340. The *Oliver* Court observed: "[i]t may be true that the Bible informs jurors' general outlook of the world and their moral values in particular, and jurors may constitutionally rely upon those morals in their deliberations." *Id.* at 340. In support, the Court cited Justice O'Connor's concurrence in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (O'Connor, J., concurring) (citation omitted): "Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them." *Id.*

59

In this case, the juror consulted the Bible during her own time and for her own personal reasons. Her consultation with the Bible was outside of and did not affect jury deliberations. In *Oliver*, the Court made clear the issue was "not whether a juror must leave his or her moral values at the door or even whether a juror may consult the Bible for his or her own personal inspiration during the deliberation process." *Id.* This is precisely how E.G.B. used the Bible in this case. Accordingly, the trial court did not abuse its discretion in denying this claim. A biblical worldview is not an impediment to jury service and atheism is not a prerequisite.

Turning to the other alleged juror-related claim of ineffective assistance of counsel, defendant argues that his conviction should be reversed because, on several occasions, a juror saw him in hand shackles.[51] In support of this argument, defendant points to the 2010 "declaration" of a juror, G.A., which states, in relevant part, that "[w]hen [defendant] was taken from the court on several occasions, we saw him in hand shackles." The juror made no further statements about seeing defendant shackled nor explained what impact, if any, this had on her during the guilt or penalty phase of defendant's trial.

In *Deck v. Missouri*, the Supreme Court held the "Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial.'" 544 U.S. 622, 624 (2005). (Emphasis in original). However, our jurisprudence reflects "the mere fact that the defendant appeared in handcuffs before a jury does not, in and of itself, constitute a basis for reversal of his conviction . . . defendant must show that jurors viewed him in restraints and that this resulted in prejudice to the defendant which affected the verdict." *State v. Smith*, 17-296, p. 6 (La. App. 5 Cir. 11/15/17), 231 So.

---

[51] This was ostensibly not raised on direct appeal because defendant did not know that the juror had seen him shackled.

3d 946, 951"). In *State v. Wilkerson*, 403 So. 2d 652, 659 (La. 1981), although the defendants were handcuffed in the presence of more than half the jury as it was leaving the courtroom, this Court found no reversible error, stating:

> . . . the defendant and his co-defendant were not handcuffed during trial. They were handcuffed solely for purposes of transport to and from the courtroom. Under the circumstances, the possibility that on one occasion several jurors may have seen the defendant in handcuffs does not appear to have so prejudiced the defendant as to warrant relief on appeal.

*See also*, *State v. Logan*, 07-739, p. 27 (La. App. 5 Cir. 5/27/08), 986 So. 2d 772, 789, (defendant "was not shackled or handcuffed during trial. He was only shackled and handcuffed for purposes of transport to and from the courtroom . . . [E]ven assuming the juror did see defendant in restraints, that brief incident does not appear to have so prejudiced defendant as to warrant relief on appeal."); *Cf.*, *State v. Spellman*, 562 So. 2d 455, 457 (La. 1990) (where defendant attended trial in handcuffs and in Orleans Parish prison clothes (his trial was in St. Bernard Parish) and a juror acknowledged that seeing the defendant in handcuffs bothered him, the Court observed: "[m]erely looking at him told jurors defendant was accused of unrelated criminal conduct elsewhere in the state. The 'constant reminder . . .' of [defendant's] condition could only have 'affect[ed] a juror's judgment' . . . Under the totality of circumstances in this case, no jury could have been expected to remain impartial and render fair judgment.").

Here, defendant has not shown the jury observed him in shackles during the trial proceedings. As in *Wilkerson*, defendant was only seen shackled, for security purposes, while being escorted out the courtroom. Defendant has further failed to demonstrate any prejudice resulting from the juror having seen him shackled.[52] This claim is without merit.

---

[52] Defendant is misplaced in his contention the trial court "did not place the appropriate burden upon the State to prove that [defendant's] appearance in shackles did not prejudice the jury." It is not the State's burden to prove prejudice. *See*, *e.g.*, *State v. Cleveland*, 630 So. 2d 1365, 1370

### *Additional claims ineffective assistance of counsel*

Defendant raises a series of additional claims of ineffective assistance of counsel. These include: the failure of trial counsel to object to testimony regarding distance, angle and trajectory of gunshots in relation to the autopsy report, admission of the victims' clothing and gruesome photographs, the admission of autopsy reports, the failure to require a pathologist to testify about the autopsy report, the failure of trial counsel to make contemporaneous objections, and improper and inflammatory comments made by the prosecutor in closing argument (the prosecutor referred to defendant as "cold-blooded."[53]).

The issue of the admission of the photographs was considered and rejected in *Robinson I* and we find no compelling need to revisit that issue. *See Robinson I*, 02-1869, p. 28, 874 So. 2d at 85.[54] As to the remaining claims, defendant offers no arguments which merit the reversal of his conviction. We are guided, again, by *Strickland*, where the United States Supreme Court advised: "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*, 466 U.S. at 68. Defendant has not shown that counsel's decisions

---

(La. App. 2 Cir. 1994) ("there must be a showing *by the defendant* that jurors viewed the defendant in restraints and that this resulted in prejudice to the defendant which impacted the verdict.") (Emphasis added); *State v. Calhoun*, 554 So. 2d 127, 132 (La. App. 2nd Cir. 1989) ("defendant has not demonstrated that any prejudice resulted from his legs being shackled."). It is likely jurors in a first degree murder case would be more surprised by the absence of restraints on a defendant than by their presence.

[53] This Court has previously found no reversible error when a prosecutor characterized a defendant as a "cold-blooded killer" and an "animal." *State v. Bridgewater*, 00-1529, p. 33, 823 So. 2d at 903; *see also*, *State v. Tassin*, 11-1144, p. 27 (La. App. 5 Cir. 12/19/13), 129 So.3d 1235, 1253 ("prosecutor's remarks in the instant case [including reference to the defendant as a cold-blooded killer], while outside the scope of rebuttal argument and improper, were not so inflammatory or prejudicial as to warrant reversal of defendant's conviction.").

[54] In *Robinson I*, we found "the trial court's decision to admit the crime scene photographs did not violate defendant's right to a fair trial because the photographs possessed probative value, and further, the contents were not so gruesome as to overwhelm the jury and cause them to convict based on insufficient evidence." *Id.*

on these issues, viewed at the time of trial without "the distorting effects of hindsight," fell outside "the wide range of reasonable professional assistance." *Id*.

### *Cumulative effective of Brady and ineffective assistance of counsel claims*

When evaluating a *Brady* claim or an allegation of ineffective assistance of counsel, courts consider the cumulative effect of either the evidence withheld by the state or the deficiencies of defense counsel to determine whether defendant was prejudiced, and relief should be granted. *Kyles*, 514 U.S. at 441 (referring to the cumulative evaluation of the prejudice prong of the *Brady* analysis); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 688). However, there is no precedent requiring this Court to consider the cumulative effect of meritless Brady or ineffective assistance of counsel claims together and we decline to do so here. *See State v. Reeves*, 18-0270, pp.14–15 (La. 10/15/18), 254 So.3d 665, 677 (given a defendant's "failure to show prejudice as a result of any of the claimed errors, he cannot show that their combined effect entitles him to relief.") (citing *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) (rejecting cumulative error claim, finding that "twenty times zero equals zero.")).

### CONCLUSION

For the reasons set forth herein, we find no abuse of discretion in the trial court's denial of defendant's application for post-conviction relief. We therefore vacate our decision in *Robinson II* and affirm the trial court's judgment. Defendant's conviction and sentence are hereby reinstated.

**VACATED; TRIAL COURT JUDGMENT AFFIRMED; CONVICTION AND DEATH SENTENCE REINSTATED.**

# SUPREME COURT OF LOUISIANA

### No. 2021-KP-00812

### STATE EX REL. DARRELL J. ROBINSON

### VS.

### DARRELL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY, ANGOLA, LOUISIANA

*On Supervisory Writ to the 9th Judicial District Court, Parish of Rapides*

On Rehearing

**WEIMER, C. J.**, dissenting.

For the following reasons, and for the reasons more fully set forth in the original majority opinion in this matter, I respectfully dissent.

No one disputes that the murder of the four victims in this case was a horrific event; nor does anyone dispute the sensational and appalling nature of the crime. However, the manner in which the murders unfolded is not the issue before the court. The question here is not whether a terrible crime was committed, but whether, in light of the undisclosed evidence, the defendant received a fair trial, *i.e.*, a trial resulting in a verdict worthy of confidence. **Kyles v. Whitley**, 514 U.S. 419, 434 (1995).

A graphic description of the murders does not bring solace to those left behind. Neither does it pay respect to the memory of the decedents; and it certainly does not further the inquiry with which this court is charged. There is no dispute that the State made errors in the prosecution of this case. The district court found multiple evidentiary omissions. The District Attorney and Assistant District Attorney who first reviewed the matter–who looked at the prosecution independently and with fresh eyes–entered into a nine-page Joint Stipulation of Fact with the defense, agreeing that

extensive evidence had not been disclosed by the State at trial.[1] In agreeing to the Joint Stipulation, these prosecutors recognized the importance of fairness and impartiality to the administration of justice, regardless of and even despite the nature of the offense.[2] That is our task in reviewing any case before the court and it is the task here: ensuring that the defendant received a fair trial.

The question here, quite simply, is how many of the numerous evidentiary omissions identified by the district court are constitutionally tolerable. And that can only be judged by weighing their cumulative effect. **Kyles**, 514 U.S. at 436. I continue to adhere to my original position that the multiple suppressions that occurred below, considered in light of the evidence that each side presented at trial, resulted in a verdict that is not worthy of confidence, and that defendant was deprived of a fair trial.

Rather than refute, point by point, the evaluation of the evidence and analysis of the majority on rehearing, I would simply defer to the original majority opinion for that exercise. I write here primarily to point out the problems illustrative of the majority's analysis as evidenced, in particular, by its discussion of the suppressed beneficial treatment afforded jailhouse informant Leroy Goodspeed.

---

[1] It was only after Michael Shannon, the retired prosecutor who tried the case, interjected himself into the proceedings in a highly irregular and potentially unprecedented move that the State sought to withdraw from the previous stipulations that had been negotiated over months and only after extensive and careful investigation of the evidence.

[2] In fact, jurors are routinely instructed on the importance of avoiding the resort to passion and sympathy in which the majority engages. The Louisiana Civil Law Treatise on Criminal Jury Instructions includes among its general instructions:

> As jurors, you are not to be influenced by mere sympathy, passion, prejudice, or public opinion. You are expected to reach a just verdict.

CHENEY C. JOSEPH & P. RAYMOND LAMONICA, 17 LOUISIANA CIVIL LAW TREATISE: CRIMINAL JURY INSTRUCTIONS AND PROCEDURES (3rd ed. 2012), § 3:8.

In its eagerness to recount the gruesome details of the murders, the majority gives short shrift to the fact that the State's case against defendant was built entirely on circumstantial evidence and the testimony of jailhouse informant, Leroy Goodspeed, and that Goodspeed's testimony was the *only* evidence indicating defendant was the actual perpetrator of the crime. However, it is in that context that defendant's **Brady**,[3] **Giglio**,[4] and **Napue**[5] claims must be evaluated. Sensationalizing the scene of the crime is not part of that evaluation.

In addressing defendant's allegation that the State failed to disclose that Goodspeed testified in exchange for beneficial treatment, the majority summarily dismisses the district court's factual finding that the evidence presented at the post-conviction hearing demonstrates that Goodspeed both desired to have a deal[6] and received special treatment in exchange for his testimony.[7] It accomplishes this feat by altering the showing required, asserting that it was defendant's burden to prove that an undisclosed deal existed prior to defendant's trial, and then finding that "[t]he record reflects no direct evidence supporting the claim that the State offered anything

---

[3] **Brady v. Maryland**, 373 U.S. 83 (1963).

[4] **Giglio v. United States**, 405 U.S. 150 (1972).

[5] **Napue v. People of the State of Illinois**, 360 U.S. 264 (1959).

[6] The district court, after recounting just some of the evidence adduced at the hearing, found: "The record is full of instances, circumstantial, that further supports the flawed character of Goodspeed and his desire to have a deal."

[7] The district court, after suggesting it appeared Goodspeed may have been allowed special treatment, provided specific examples of evidence demonstrating that Goodspeed was indeed afforded special treatment:

> The records submitted show that the State twice entered pardons into the state's offender tracking system, when that is typically not an option for offenders. Robinson's team provided affidavits from other witnesses who reported that Goodspeed after testifying made comments to an inmate, Kevin Nichols, about receiving a deal. Documentation existed where communications between the Rapides Assistant District Attorney and Lafayette Assistant District Attorney exchanged phone messages and shortly after the Robinson trial, the Lafayette charges were dismissed.

3

to Goodspeed in exchange for his testimony before trial." **State ex rel Robinson v. Vannoy**, 21-KP-00812 (La. 11/__/24) (on rehearing), slip op. at 13. In other words, according to the majority, what is required is "a showing that in advance of trial, the State made an agreement to secure the witness's testimony," and no such showing was made in this case. *Id.* at 18. The majority's statement in this regard is not an accurate reflection of the law under **Brady**, and it is not an accurate reflection of the law in this court.

Insofar as the federal courts are concerned:

[T]he Supreme Court has never limited a **Brady** violation to cases where the facts demonstrate that the state and the witness have reached a bona fide, enforceable deal. In **Napue v. Illinois**, 360 U.S. 264, 270, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Supreme Court explained that the key question is not whether the prosecutor and the witness entered into an effective agreement, but whether the witness "might have believed that [the state] was in a position to implement ... any promise of consideration." *Id.*; see **Giglio v. United States**, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); **Tassin v. Cain**, 517 F.3d 770, 778 (5th Cir. 2008)("A promise is unnecessary.").

**LaCaze v. Warden Louisiana Correctional Institute for Women**, 645 F.3d 728, 735 (5th Cir. 2011). As this court has explained:

[T]o the extent exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." **State v. Brady**, 381 So.2d 819, 822 (La. 1980) (collecting cases); see also **State v. Nash**, 475 So.2d 752,755-56 (La. 1985). A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct. *Id.*

**State v. Vale**, 95-1230, p.4 (La. 1/26/96), 666 So.2d 1070, 1072.[8]

---

[8] The cases cited by the majority for its new rule, **State v. Williams**, 338 So.2d 672 (La. 1976), and **Medellin v. Dretke**, 371 F.3d 270 (5th Cir. 2004), pre-date both **Vale** and **Lacaze** and, thus, in addition to being factually distinguishable, do not represent the latest expressions of the law.

Here, the testimony at the post-conviction hearing demonstrates that Goodspeed had charges pending in both Rapides and Lafayette Parishes. While the State went to great lengths to dispel any notion that Goodspeed had received beneficial treatment in connection with his Rapides Parish charges, going so far as to call Goodspeed's Rapides Parish defense attorney at defendant's trial to verify that Goodspeed's testimony was not a factor in his lenient sentence in Rapides Parish, once he had received the benefits for which he had bargained, Goodspeed told post-conviction investigator Herrero that "he had been given a deal by ADA Michael Shannon in exchange for his testimony against Darrell Robinson." Goodspeed went on to explain that evidence of the deal could be found in the Lafayette Parish prosecutor's files. The undisclosed communications between the Rapides and Lafayette Parish DA's offices that followed on the heels of Goodspeed's testimony at defendant's trial, and the subsequent dismissal of Goodspeed's first degree robbery charge and his issuing worthless check charge because "Mr. Goodspeed was an essential witness in a murder trial," corroborate Goodspeed's statement to Ms. Herrero. Further, Kevin Nichols, Goodspeed's cell mate at the time of defendant's trial, testified at the post-conviction hearing that Goodspeed was upset when he returned from testifying because he felt he had been "incriminated" on cross-examination and, as a result, his deal might not go through, providing further evidence of Goodspeed's belief that he would be receiving favorable treatment in exchange for his testimony.

The majority attempts to discount the defendant's evidentiary showing by mischaracterizing what Goodspeed told Ms. Herrero. According to the majority, "Goodspeed did not tell Herrero that he had a deal with the state *before* he testified, only that he received a deal *after* he testified." **State ex rel Robinson**, slip op. at 12,

5

n.14. With all due respect, *what Goodspeed told Herrero was that "he had been given a deal by ADA Michael Shannon in exchange for his testimony against Darrell Robinson."* It makes no difference when the deal was consummated; only that Goodspeed believed that the State was poised to offer him leniency "in exchange" for his testimony; *i.e.*, if he testified. The majority likewise attempts to discount the corroborating testimony of Kevin Nichols (demonstrating that Goodspeed testified under the belief he had a promise of leniency), questioning Nichols' credibility because he did not mention Goodspeed's fears of having scuttled his deal with prosecutors until around 2010 and 2014. The majority then juxtaposes the testimony of Herrero and Nichols with that of Shannon, Armitage, Delcomyn, and Goodspeed and substitutes its own credibility determination for that of the district court, deciding that Herrero and Nichols are simply unworthy of belief.[9] It is the district court, who saw the witnesses and evaluated their testimony, who is entrusted to make credibility determinations, and this court must defer to those credibility determinations. See, **State v. Thompson**, 11-0915, pp. 13-14 (La. 5/8/12), 93 So.3d 553, 563.

The majority continues its divide and conquer approach to the defendant's evidentiary showing when it addresses the undisclosed evidence of favorable treatment Goodspeed received *prior to* his testimony. For example, with respect to the handwritten notations on the transcript of the interview with Becky Goodspeed,

_____

[9] The majority posits that to accept the testimony of Herrero and Nichols would be to "implicitly find" that Shannon, Armitage, Delcomyn, and Goodspeed all committed perjury. However, defendant does not challenge Armitage's testimony with regard to the plea deal in Rapides Parish, and Goodspeed has recanted (or at least attempted to recant) his testimony. As to Nichols, the majority characterizes it as "ironic" that it should be asked to accept the testimony of one jailhouse snitch (Nichols) over another (Goodspeed), conveniently ignoring that Goodspeed had everything to gain by denying the existence of a promise of favorable treatment, and that Nichols has remained steadfast in his testimony that Goodspeed told him prosecutors were supposed to give him a deal if he testified against defendant.

6

the majority dismisses the evidentiary value of the notation ("try and reconcile...said this may help you to get out Det.") because it fails to suggest any offer by the State. **State ex rel Robinson**, slip op. at 17. As to the pardons entered into the State's CAJUN offender tracking system, the majority dismisses them because there is no evidence the pardons "were *directed* to be entered *as a benefit* to Goodspeed to induce his testimony." *Id.*, slip op. at 16. Similarly, with respect to the letter to Judge Foote advising that Goodspeed had been arrested in Lafayette Parish and recommending that no action be taken revoking his probation at that time, the majority rejects the letter's evidentiary value because it does not "reference any deal with Goodspeed and does not suggest any benefit to Goodspeed." *Id.* However, this analysis misses the point. This undisclosed evidence[10] was material because, while circumstantial (just like the case against defendant), it calls into question Goodspeed's claim that he received no special favors from the State and, thus, was valuable impeachment evidence of which the defendant was deprived.

The above-mentioned flaws in the majority's analysis and rejection of defendant's claim that the State failed to disclose that Goodspeed testified in exchange for beneficial treatment in violation of **Brady** are but one example of the majority's problematic approach to defendant's post-conviction claim. There are others which, for purposes of this dissent, are not necessary to recount.

It suffices that, for the reasons more fully set forth in the original majority opinion in this case, I remain convinced that defendant is entitled to a new trial because the State failed to disclose that it provided Goodspeed with a substantial reward for his testimony against defendant in violation of **Brady**, and because the

---

[10] It takes the majority the better part of two pages to list all of the benefits afforded Goodspeed that were withheld from the defendant. **State ex rel Robinson**, slip op. at 11-12.

7

State elicited misleading testimony intended to convince the jury that Goodspeed's testimony was free of inducement in violation of **Giglio** and **Napue**.

As the original opinion details, at trial, the prosecutor and Goodspeed informed the jury that Goodspeed testified against defendant without inducements. To prove Goodspeed gained nothing from his testimony against defendant, the State even called attorney W.T. Armitage, who had represented Goodspeed in his recent favorable guilty plea in Rapides Parish, to testify that Goodspeed's plans to testify against defendant were not a factor in his lenient sentence. Yet, despite this testimony, the evidence demonstrates that the State had arranged for Goodspeed to receive substantial preferential treatment in a different parish in exchange for Goodspeed's testimony against defendant.

This suppression was material because Goodspeed's testimony was the only evidence demonstrating defendant was the actual perpetrator of the murders. While the defense showed that Goodspeed had a lengthy criminal history and suffered from mental illness and substance abuse disorders, the State's actions hid Goodspeed's bias to create a false sense of his credibility. See, **LaCaze**, 645 F.3d at 736 ("The materiality inquiry does not turn on which of two competing sources of bias a court, in hindsight, determines the jury would have considered more important.").

In addition, I remain convinced that defendant proved that the State violated **Brady** by failing to disclose serology analysis by the North Louisiana Crime Lab. The undisclosed documents show that lab analysts detected high-velocity blood spatter on a bloodstained jacket found near the victims' bodies. Since high-velocity blood spatter can only result from a violent injury, this suggests a connection between the jacket's bloodstains and the murders. Such information is exculpatory because pre-trial DNA testing of the bloodstains excluded defendant and the victims as the

8

blood's source. The defendant could have used the high-velocity spatter information to counter the State's trial argument that the unidentified blood resulted from work on the victim's farm, unrelated to the murders. This would have provided the defendant with physical evidence suggesting another person was involved in the murders. The non-disclosure of this evidence takes on even more significance in light of the fact that ***post-conviction investigators compared the unidentified DNA to alternate suspect Mark Moras and found it was a match***. At the time of the murders, Moras had been charged in Rapides and Avoyelles Parish with multiple counts of theft and forgery for having written himself checks using victim Billy Lambert's checkbook. Shortly before the murders, Lambert and Moras fought, with the exchange ending in gunfire.

In the final analysis, when considered in the aggregate, as it must be, the undisclosed impeachment and blood-spatter evidence, along with other crime scene evidence not disclosed, support the conclusion reached on original hearing: that defendant did not receive a fair trial, or a verdict worthy of confidence, and that he is entitled to a new trial.

# SUPREME COURT OF LOUISIANA

## No. 2021-KP-00812

## STATE EX REL. DARRELL J. ROBINSON

### VS.

## DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY, ANGOLA, LOUISIANA

On Supervisory Writ to the 9th Judicial District Court, Parish of Rapides

On Rehearing

**Crichton, J., additionally concurs and assigns reasons.**

Following this Court's rehearing grant and an even deeper examination into the particular issues urged by the state in its briefing, I conclude that the evidence withheld by the state in this case would *not* have "caused at least one juror to [ ] entertain some residual doubt about defendant's guilt." *State ex rel. Robinson v. Vannoy*, 2021-0812, p. 51 (La. 1/26/24), 378 So.3d 11, 50 (Crichton, J., concurring in part, dissenting in part). I therefore agree with the majority opinion overturning our prior decision reversing defendant's convictions and death sentences. I write separately to articulate why I find, even in the absence of the undisclosed evidence, the death sentences imposed in this case *are* "worthy of confidence" and should not be overturned. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

On rehearing, Robinson failed to present sufficient evidence "from which one can reasonably infer Goodspeed was incentivized by the state to testify against defendant." *Id.*, 2021-0812, p. 51, 378 So.3d at 47 (Crichton, J., concurring in part, dissenting in part). There was evidence that *after* defendant's trial, the state dismissed Goodspeed's charges in Lafayette Parish because he was "an essential witness in a murder trial." All communications between the prosecutors relating to

that assistance occurred after Goodspeed testified. Defendant presented no evidence that *before* trial, the state had promised Goodspeed any assistance in exchange for his testimony. Thus, defendant has not shown there was any agreement with Goodspeed that the state could have turned over to the defense before trial. [1] Nor has defendant provided any evidence that before trial, any representative of the state knew that Goodspeed believed or hoped that he would receive some benefit in exchange for his testimony (even if the state had not promised or assured him any future assistance).[2]

Although in the four years before defendant's trial Goodspeed received some beneficial treatment from the state,[3] defendant likewise failed to show any connection between those benefits and Goodspeed's testimony against defendant. Thus, defendant did not demonstrate that any witnesses lied when they testified that the state had not promised or provided any benefit to Goodspeed in connection with his testimony against defendant. Defendant's *Brady*,[4] *Giglio*,[5] and *Napue*[6] claims

_____

[1] The absence of evidence of any pre-trial promise or even informal assurance of future benefit from the state distinguishes this case from that of *LaCaze v. Warden Louisiana Correctional Institute for Women*, 645 F.3d 728, 735 (5th Cir. 2011), which is relied on by the dissent. In *LaCaze*, there was no *formal* agreement between the witness and the state, but there was evidence that the prosecutor gave the witness an "assurance" that if he gave a statement implicating LaCaze, his son would not be prosecuted. In that case, unlike this one, the witness' attorney likewise testified that his client "had an understanding" with the prosecutor.

[2] Indeed, defendant presented testimony from Kevin Nichols suggesting that at trial Goodspeed believed that he would get "a deal" from the state in exchange for his testimony against Robinson. While Goodspeed's subjective belief about the favorable consequences of his testimony is relevant to establish bias or motivation, *State v. Vale*, 1995-1230, p.4 (La. 1/26/96), 666 So.2d 1070, 1072, contrary the dissent's claim, it alone is not sufficient to establish a *Brady* or *Napue* violation on collateral review. What defendant has failed to show is that any prosecutor or other person working on the government's behalf knew about Goodspeed's hope he would receive leniency from the state as a result of his testimony. Without that knowledge, there was no information in the hands of the state that could have been turned over to the defense or used to correct Goodspeed's testimony, and thus no due process violation.

[3] There are, of course, a myriad of reasons, aside from seeking cooperation from Goodspeed, that the state may have chosen to grant him some form of leniency in connection with his criminal cases.

[4] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[5] *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

[6] *Napue v. People of the State of Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

relating to Goodspeed rest, at best, on mere speculation, at worst, on rampant fabrication. In any event, after deep examination, I now find that defendant did not meet his burden to show there was "some promise of additional, future aid by the state in exchange for Goodspeed's testimony against defendant." *Id.*, 2021-0812, p. 51, 378 So.3d at 48 (Crichton, J., concurring in part, dissenting in part).

In my concurring opinion, I also relied, in part, on serological evidence relating to the red jacket. The jacket, stained with spatters, smears, and drops of blood, was found hanging on a doorknob in the hallway of Lambert's house after the murders. There is no allegation the state hid the jacket from the defense. In fact, it was examined by defendant's own expert before trial. Rather, defendant only alleges that the state did not reveal that a lab technician had classified some of the stains on the jacket as "high or medium velocity spatter." Even assuming this fact was withheld by the state (the spatter was visible to defendant's expert), defendant has not established any connection between the stains on the jacket and the murders. If it *is* blood spatter on the jacket, as opposed to any other substance, defendant has not shown whose blood it is, when it got there, or whether it was in fact the result of a gunshot event. Thus, contrary to defendant's thoroughly overblown claim, the withheld serology evidence provides no material support for defendant's theory that someone other than defendant and the victims was present in the house when the murders occurred.

Finally, following rehearing, I am now of the opinion that the handwritten notations found on police documents describing the observations of two witnesses who were near the Lambert house the morning of the murder are not exculpatory. The timeline of events in this case is critical. The victims arrived at Lambert's house a few minutes after 11:40 a.m. Upon discovering the bodies at approximately 12:10 p.m., Doris Foster immediately drove to a nearby store where the clerk called

3

911 at 12:16 p.m. When she returned to the scene with the police, she noticed that Lambert's truck, which had been there when she left, was now gone.

It was soon discovered that defendant, who had been living in Lambert's home at the time, had fled the scene in Lambert's truck. At trial, the state presented evidence of defendant's highly suspicious behavior. Witnesses testified seeing him speed away from the home at about 12:15 p.m. Defendant drove erratically, swerving into other lanes of traffic, forcing motorists off the road, and side-swiping another vehicle. A chase ensued and defendant was followed until he turned down a driveway, drove through a fence, abandoned the truck behind a house, and ran into the woods where the police later found him hiding. As the officers approached him, defendant exclaimed he was unarmed and "on medication for violent tendencies."[7]

Even putting aside defendant's extremely incriminating conduct, there was a very narrow window during which defendant could have, as he argues, innocently arrived at the house after the murders occurred and fled in the truck before the first responders arrived. The notations about the witnesses' accounts provide no material support for that timeline.

One note states that a witness saw defendant dropped off at Lambert's house on the morning of the murders—this is, in fact, inculpatory as the murders occurred between 11:40 a.m. and 12:10 p.m. That witness did not testify at the evidentiary hearing and his "declaration," signed more than 20 years after the murders, not only conflicts with the handwritten notation (in claiming he was dropped off *after* noon), but also includes estimations of when events occurred based on his routine, not based

---

[7] In addition to defendant's questionable actions, the state presented additional physical evidence connecting him to the crime. When he was arrested, defendant had Nicholas Kelly's blood on the sole and lace of his shoe, Lambert's knife in his pocket, and some cash and cigarettes in his possession. At the crime scene, a spot of Nicholas's blood was found on a towel in Lambert's bedroom and Lambert's wallet, emptied of cash, was found in defendant's room. All four victims were shot with a .38 caliber gun, the same caliber gun Lambert was known to keep in the house, but the weapon was never recovered. An expert testified that gunshot residue particles were found on defendant's shirt, waistband, and pant legs.

4

on a specific memory of what occurred that day. The second notation is not exculpatory either—it merely states that the witness's brother *may have seen* a vehicle driving south on the highway near Lambert's house "([right] before lunch) — could have been 10:00." It is not clear this undisclosed information—a possible recollection of a car driving by on a busy highway during a two-hour window before the murders—is even favorable, let alone *material* to defendant's convictions or sentences.

When I now reconsider the cumulative effect of the undisclosed evidence alongside the overwhelming circumstantial evidence presented at trial (which excludes every reasonable hypothesis of innocence), I do not find that confidence in defendant's convictions or death sentences is undermined. A reasonable juror, considering *all* the evidence—disclosed and undisclosed—would not have any "lingering uncertainty about facts" sufficient "to hold out for a life sentence." *Franklin v. Lynaugh*, 487 U.S. 164, 166, 108 S.Ct. 2320, 2323, 101 L.Ed.2d 155 (1988); *State v. Lee*, 524 So.2d 1176, 1192 (La. 1987).

I also agree with the majority's finding that defendant did not receive ineffective assistance of counsel. Defendant was zealously represented at the guilt and penalty phases by highly experienced, well-regarded capital defense attorneys. Even before the trial began, these attorneys engaged in a vigorous, productive motion practice. For instance, the attorneys sought to exclude evidence that prior to the quadruple homicides, defendant had taken part in target practice on watermelons because he wanted to see the ballistics results of a gunshot to the head—the manner in which all four victims were murdered. The trial court ruled the evidence admissible, but these persistent, diligent attorneys prevailed in the appellate court ensuring the evidence was excluded. Success on this issue is one of many examples of the exceptional effectiveness of defendant's counsel.

For these reasons, I find that defendant was not deprived of his right to a fair trial as to his guilt or as to his sentences. Therefore, in all respects I join the majority in affirming the trial court's denial of defendant's application for post-conviction relief.

6